DEL BALSO CONSTRUCTION CORPORATION, Appellant, *v.* THE CITY OF NEW YORK, Respondent.

First Department, December 23, 1937.

*John F. Collins* of counsel [*Harry Merwin* and *Moses S. Finesilver* with him on the brief; *Bandler, Haas & Collins*, attorneys], for the appellant.

*Oren Clive Herwitz* of counsel [*Paxton Blair* and *Charles Blandy* with him on the brief; *Paul Windels, Corporation Counsel*], for the respondent.

TOWNLEY, J. The plaintiff contracted with the city of New York for the construction of a part of the city subway system. There was included in this contract, and in the proposal upon which the contract was based, as a part of the work to be performed, the shoring of forty buildings along the line of the subway. These

combined with other so-called incidental items amounted to at least forty per cent of the work to be done under the contract. Included therein was the shoring and underpinning of the buildings at 335–355 Schermerhorn street and 62 Flatbush avenue, belonging to the Brooklyn Storage and Warehouse Company. The bidding for this underpinning work was on a lump sum basis for each building involved. The contract price for the Brooklyn Storage and Warehouse Company building and the adjoining property was $509,000, or about ten per cent of the total contract price. After the contract was executed and during the progress of the work the city for reasons of economy purchased these properties at private sale from the Brooklyn Storage and Warehouse Company and subsequently demolished the buildings thereon. It then notified the plaintiff that it elected to withdraw from the work contracted for that part which involved the shoring and underpinning of these buildings. Plaintiff refused to recognize the city's right to withdraw this work and brought this action to recover the profit it had lost by reason thereof. The other causes of action stated in the complaint have been disposed of and are not involved in this appeal.

Authority for the withdrawal is claimed to be found in the following provisions of the contract:

"Article XLIII. Drawings may be amplified or altered.   *   *   *

" (b) The Board further reserves the right to alter, in any way it may deem necessary for the public interest, the drawings aforesaid, in part or altogether, at any time during the progress of the work or to omit any portion of the work without constituting grounds for any claim by the Contractor for payment or allowance for damages or extra service other than is provided for under the classified items of the Schedule of Unit Prices."

"Article XLII. Quantities are approximate.   *   *   *   and the Contractor shall make no claim for damages or for anticipated profit or for loss of profit because of a difference between the quantities of the various classes of work actually done or materials actually delivered and the estimated quantities of items stated in the Contractor's Proposal or because of the entire omission of any of the quantities of items stated in the Contractor's Proposal."

In the contractor's proposal it was stated, " It is further understood that the Board reserves the right to increase or to diminish or to omit entirely any of the quantities of items as therein stated."

The question before us is whether under the above-quoted provisions the city was privileged to omit this substantial item. The second and third provisions referred to are obviously limited in their application to that portion of the work which was to be done on a

unit basis and have no application to that part of the contract which is covered by lump sum bids such as are involved here.

If authority for the omission is to be found at all, it must be found in article XLIII. The portion of subdivision (b) which authorized the alteration of " the drawings aforesaid, in part or altogether, at any time during the progress of the work," was construed by the Court of Appeals in *Litchfield Const. Co.* v. *City of New York* (244 N. Y. 251). In that case it was held that these provisions did not warrant the omission of a spur only 187 feet long constituting only about two per cent of the total contract work. To the same effect see also *McMaster* v. *State of New York* (108 N. Y. 542) and *Peterson* v. *City of New York* (205 id. 323).

In *McMaster* v. *State of New York* (*supra*) the court in its opinion said, referring to the provision in question (p. 551): " We are of opinion that it cannot have the effect claimed for it and that it did not authorize the change made. What change did the State reserve the right to make? It certainly had no right to omit entirely the construction of all or any of the buildings. * * * These were all to be built. The size and height of them were fixed and the material to be put in the walls was determined. The general character of the buildings could not be changed so that the buildings would not be the same contracted for; if it could be, then a public letting in such a case would not be a useful and might be an idle ceremony. Under such a reservation could a building planned for five stories be reduced to two? Could a stone building let to a stone mason be changed to wood or brick? Could the five connecting wards be reduced to two or three or four? We are clear that authority for such extensive changes could not be found in such language. If the State could change to brick walls with sandstone trimmings, then it could change to walls made wholly of brick, and thus there would be no stone to cut and the cutting contract would be entirely nullified. It is difficult, probably impossible, to draw in advance a precise line between what is authorized by such a reservation and what is not. It authorizes such changes as frequently occur in the process of constructing buildings, in matters of taste, arrangements and details; but it does not authorize a change in the general character of the building. If it does, a contract carefully entered into could be mainly if not entirely frustrated."

The additional words, " to omit any portion of the work without constituting grounds for any claim by the Contractor," were apparently included in city specifications to avoid the effect of the decision in *Litchfield Const. Co.* v. *City of New York* (*supra*). We do not think that the added words destroy the controlling principle

of the *Litchfield* and other cases. To give literal effect to the words the contractor would be bound, but the city would be bound only to the extent it elected to be. Such construction would destroy the mutuality of the contract. The protection found in the requirement that city contracts be let after public bidding would be entirely lost. A favored contractor might be relieved of all the burdensome part of his work by withdrawals and collect unreasonable compensation for the part performed. There would be no competition either as to the work done or the price paid.

The city, it is true, does not claim that the words may be given their full literal effect. It apparently contends that there is some lesser degree of control effected under which they may withdraw " incidental work." What is meant by " incidental work " and just what may be included in this category is something that we need not determine here. It certainly cannot include an item representing about ten per cent of the total work, which belongs to a class of work which represents at least forty per cent of the entire contract. If they can withdraw the shoring of one building, why not the balance called for by the contract?

That the clause relied on was not intended to apply to this part of the contract is indicated by the provisions of the " special specifications " applicable to this work. The quoted clause is found as a part of the general contract provisions which are applicable in general to any contract of this type. In addition to the standard specifications there is a set of " special specifications " applicable only to the work to be performed under this contract. These " special specifications " contain specific provision with reference to the underpinning of these warehouse buildings. They also contain in their specification of work in connection with some other buildings an express reservation of the right to change or withdraw the work called for. There is no such reservation as to the buildings involved here. The specific provisions of the contract contained in the " special specifications " must prevail over the general provisions contained elsewhere in the contract. (*Wilson & English Const. Co.* v. *N. Y. C. R. R. Co.*, 240 App. Div. 479.)

The provisions found in article XLIII relied on by the city are a part of the general contract provisions adopted by the board of transportation on August 21, 1928, for the construction of a rapid transit railroad and are apparently prepared for use in all subway contracts, whereas, the " special specifications " were prepared for this particular undertaking. It is clear that it was never intended that the board could at any time omit the underpinning of these warehouse buildings without compensation to the plaintiff.

The judgment, so far as appealed from, should be reversed, the action severed and a new trial ordered as to the second cause of action, with costs to the appellant to abide the event.

MARTIN, P. J., O'MALLEY and COHN, JJ., concur; DORE, J., dissents and votes for affirmance.

DORE, J. (dissenting). The provisions of article XLIII of the contract in issue are materially and essentially different from the clause in the contract construed in *Litchfield Const. Co. v. City of New York* (244 N. Y. 251) and radically distinguish that case from the case at bar. The facts, too, were materially different as the work omitted in that case was a portion of the railroad that was to be constructed.

Some meaning must be given to the additional terms inserted in the clause permitting the elimination of items where necessary for the public interest. The city does not claim the right was unlimited and unrestricted. This decision must be limited to the facts in this case, and here there is actually involved not forty per cent but ten per cent of the work classified as incidental, and this ten per cent is calculated on the amount of the bid for the items in question which on the evidence adduced appears to have been inflated beyond reasonable cost. The contract provided that the contractor would receive $509,000 for underpinning the two warehouse buildings. According to plaintiff's own witness, the cost of underpinning one of these — the large warehouse — would have been only $207,423, showing a profit included in that item of about $298,000 on a total bid of $505,000 for underpinning of this particular building. Buying the entire property outright and demolishing the buildings indicated a saving to the city of $384,000.

The facts here show that there were reasonable grounds for eliminating the items and not mere whim and caprice or fraud. No change in the general character of the contract was made; the main purpose and essential identity of the thing contracted for were preserved. Under the terms of the contract and all the facts and circumstances disclosed the change from underpinning to demolition was permissible without making the city liable for the anticipated profits on the items.

Accordingly I dissent and vote to affirm the judgment in defendant's favor.

Judgment, so far as appealed from, reversed, the action severed, and a new trial ordered as to the second cause of action, with costs to the appellant to abide the event.