[Civ. No. 15408.  First Dist., Div. One.  Nov. 24, 1953.]

H. H. BOOMER, JR. et al., Appellants, v. GEORGE W. ABBETT, Respondent.

Erskine, Erskine & Tulley and Blewett, Blewett, Macey & Garretson for Appellants.

Melvin, Faulkner, Sheehan & Wiseman for Respondent.

PETERS, P. J.—Defendant, George W. Abbett, entered into a contract with the United States Bureau of Reclamation to construct a transmission line in Northern California. Plaintiffs H. H. Boomer, Jr., and S. C. Giles, a copartnership, entered into a subcontract with defendant to perform the excavation for and installation of the transmission line towers, and certain other work, called for by the prime contract. The bureau, purporting to act under the terms of the prime contract, issued a change order that affected the method and amount of excavation on 1 mile out of the total of 25 miles of the transmission project. This change order asked for new bids on some of the excavation work in this limited area. The plaintiffs promptly and vigorously objected, and contended that the prime contract and their subcontract covered the additional work called for by the change order, and refused to bid on the excavation work called for by the change order. The work on this portion of the job was awarded to another. Later, another change order and a stop order were issued by the government stopping all work in the disputed area and deleting this work from the prime contract. Plaintiffs have been fully paid for all past work. They incurred substantial preparatory expenses and also suffered a major loss of claimed profits. This action was then

brought against defendant for breach of contract, it being averred that defendant had wrongfully repudiated the subcontract, and hindered performance thereunder. Damages were asked for preparation expenses in the form of debts and judgment liabilities owed to plaintiffs' subcontractors for material and equipment costs, for a portion of the cost of doing business, and for loss of profits. The case was tried before a jury. At the conclusion of the evidence the trial court granted a directed verdict in favor of defendant. On plaintiffs' motion for a new trial it was ordered that such motion would be denied on condition defendant stipulated to pay to plaintiffs the sum of $3,152.71. A check in that amount was delivered by defendant to plaintiffs, subject to a stipulation that acceptance of the check would not adversely affect plaintiffs' right of appeal. The new trial was then denied, and this appeal followed.

This being an appeal from a judgment based on a directed verdict, the problem presented is whether there were any factual issues that should have been presented to the jury, that is, whether there was any evidence, or any reasonable inferences therefrom, that would have supported a judgment in favor of plaintiffs, at least in an amount in excess of that allowed on the motion for a new trial. If so, it was error to have taken the case from the jury. To determine this question some of the evidence in the lengthy reporter's transcript must be reviewed. Inasmuch as we have concluded that a reversal is required, it should be stated that in the summary of evidence that follows all conflicts have been resolved, as required by law, in favor of appellants. Therefore, when it is stated in that summary that there was evidence as to certain facts all that is meant is that there is evidence in the record, contradicted or uncontradicted, as to those facts. Where the evidence is conflicting, on the new trial, the jury may, of course, find that some of the facts contained in this statement of facts are not true.

The job involved was for the construction of a transmission line of about 25 miles in length in Northern California, that required the construction of an estimated 225 steel towers. Abbett, the individual defendant, after competitive bidding, contracted, under date of October 24, 1947, with the Bureau of Reclamation to do the construction work on the project for $587,383. On December 18, 1947, the plaintiffs, a copartnership, entered into a subcontract with defendant, whereby they contracted to furnish all material and perform

all work in reference to the excavation, concrete, reinforcing, and some welding upon the transmission towers. The plaintiffs contracted for this work, with one exception, at a level allowing the defendant a 10 per cent profit upon his bid. The contract estimated that 225 steel towers were to be constructed. Since the prime contract did not contain final specifications, plaintiffs could only estimate their total bid, which they did at $196,747.50. This contract, so far as excavation work was concerned, called for payment to plaintiffs at a price fixed at so much a unit of excavation in accordance with lines to be staked out by bureau employees at each tower site.

Certain provisions of the prime contract and of the subcontract are relevant to the problems here involved. The prime contract is a regular form contract prepared by the government for use on such projects. It contained a complete schedule of the unit and lump sum payments to be made by the bureau to the prime contractor. Article 3 provided that the contracting officer of the bureau "may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof." Changes in amounts due as a result of such changes were to be settled by an "equitable adjustment." Changes involving estimated increases or decreases of more than $500 could not be ordered without the approval in writing of the head of the department. Claims for adjustment under this provision had to be asserted within 10 days after the change was ordered, provided that the contracting officer, with the approval of the head of the department could, if he determined the facts warranted it, consider any claim up to the date of final settlement of the contract. Disputes over such adjustments were to be settled in accordance with the "disputes" clause of the contract contained in article 15.

Article 4 provided that if either party should discover "during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings . . ., or unknown conditions of an unusual nature differing materially from those ordinarily encountered" the contracting officer should be notified, and if he found the conditions different from those specified, the contract should, with department head approval "be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions." This provision apparently contemplated that the contractor should perform the

increased work called for, and that new bidders should not be solicited.

Article 15 is the "Disputes" clause. It provided that except as otherwise provided "all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department . . ., whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed."

The specifications are attached to the prime contract and are made an integral part of it. Paragraph 13 of the specifications provided, among other things, that if the contractor "considers any record or ruling of the contracting officer . . . to be unfair" he shall ask for written instructions, continue with the work in accordance with the ruling, and within 20 days after receiving such instructions he shall file a written protest with the contracting officer. Unless such protest is made, the ruling of the contracting officer "shall be final and conclusive." Paragraph 33 of the specifications classifies the various types of excavation work called for and covered by the contract. Subdivision (a) defines "Rock excavation." Subdivision (b) defines "Common excavation" as "Excavation of all material other than rock as defined above, including, but not restricted to earth, gravel, and such material as hard pan, cemented gravel, and soft or disintegrated rock; also all boulders or detached pieces of solid rock not exceeding one-half cubic yard in volume . . ." Paragraph 34 of the specifications provided, in part, that "All excavation for tower footings shall be made accurately to the locations, grades, and neat lines of excavation shown on the drawings, insofar as practicable. . . ." Subdivision (c) of this paragraph provided that payment for excavation would be made at applicable unit prices per cubic yard as set forth in the bids. Another portion of this subparagraph contained a "changes" clause particularly applicable to excavation. It provided that "During the progress of the work, it may be found necessary or desirable to vary the slopes or the dimensions of the excavations from those shown on the drawings, staked out, or otherwise established by the contracting officer, and the contractor shall be entitled to no additional allowances above the unit price per cubic yard bid in the schedule for excavation by reason of such changes: *Provided*, That if such changes are made after the excavation has been made

to the slopes and dimensions shown, staked out, or otherwise established, and if it is determined by the contracting officer that unit costs will be increased or decreased as a result of such changes, the excavation to the changed slopes or dimensions will be ordered, in writing, as extra work by the contracting officer and payment will be made in accordance with article 5 of the contract and paragraph 9 of these specifications." Paragraph 57 of the specifications is also pertinent. It provides, in part: "The following tables indicate the estimated number of towers that will be required in the transmission lines covered under these specifications. These quantities are approximate only and the Government does not guarantee the construction of all or any number of the towers listed."

The subcontract between plaintiffs and defendant, which is a standard printed form of subcontract used by subcontractors on public work, refers to the prime contract, provides that appellants agreed to perform the portion of the work covered "in accordance with the General Conditions" and specifications of the prime contract, and that the "General Conditions, Drawings and Specifications" of the prime contract "hereby become a part of this Contract." Another clause provided that the subcontractor agrees to be bound to the prime contractor by the terms, conditions and specifications of the prime contract and "to assume . . . the obligations and responsibilities" of the prime contractor as set forth in his contract with the government. The subcontract also provided that the subcontractor agreed to make "all claims for extras . . . and for damages for delays or otherwise, to the Contractor" in the manner provided in the prime contract.

The plaintiffs started performance of their subcontract in December of 1947, being paid periodically by the unit according to pay lines fixing the boundaries and depth of each excavation at each tower site as set forth by bureau employees. The subcontractor had estimated the total cost of the work covered at $196,747.50, but, because more work was called for than originally contemplated, the appellants were in fact paid $218,989.19 in accordance with the unit prices set forth in the subcontract. They testified, however, that no profit was made on the excavation work paid for—in fact, losses were incurred. Plaintiffs concede that they were paid for all completed work performed by them, and for all materials furnished in connection with the completed work.

Everything proceeded without difficulty until February of 1948. On February 3d the defendant wrote to plaintiffs setting forth several complaints made by bureau engineers, and stating that "the Bureau will require excavation of several hundred cubic yards of material now unclassified in our contract. This excavation is located in the Placer Mining Area. Please give us your quotation as soon as possible so that we can obtain authority to proceed." It appears from the evidence that this "Placer Mining Area" had not been previously tested by any government borings. It turned out that this area was covered with dredger tailings, material that could be removed with power equipment. Plaintiffs promptly notified defendant that they refused to bid upon this project because they contended that this so-called new work was already included and covered by the prime contract and their subcontract. They contended that the removal of the dredger tailings was but another form of excavation necessary to be made to install the footings for the towers. The removal of these dredger tailings was much easier than the work covered by the balance of the contract, and plaintiffs therefore expected to make a big profit in this area, that would permit them to recoup losses suffered in other areas.

Under date of May 13, 1948, bureau employees wrote to defendant notifying him that the heights of some 12 designated towers in this area were to be increased, that the required excavations would have to be deeper. The letter stated that the excavation of "overburden-dredger tailings" was not covered by the original contract and requested new unit prices for this work, and for certain other additional work. This letter apparently was written pursuant to change order No. 2 dated February 5, 1948, and addressed to defendant. By this change order the government, purporting to act under article 3 of its contract, ordered changes in the heights of 12 towers in the dredger area and in the nature and depth of the excavations required. The change order provided that for excavating "overburden-dredger tailings for footings" of the 12 towers defendant would be paid but $.75 per cubic yard.

On May 14, 1948, defendant made a public request for new bids on the excavation work covered by the change order. Plaintiffs refused to bid, and this new work was awarded to one Draper at $.60 per cubic yard. Between May and July of 1948 plaintiffs vigorously protested to defendant the bureau's actions, asserting their right to undertake this newly-

specified excavation work under their contract and at the prices therein contained, but expressing a willingness to perform the other new work called for by the change order at the new rates. Defendant conveyed these objections to the bureau officials, but did not file a formal protest. In July, 1948, plaintiffs were notified that the excavation work involved in the dispute had been awarded to others. Plaintiffs again protested by letter to defendant. Defendant, in two letters dated in July of 1948, ordered plaintiffs to perform the work in this area, other than the removal of the dredger tailings overburden, in accordance with the revised plans. Plaintiffs proceeded to try to comply by purchasing materials and letting subcontracts. However, on August 4, 1948, plaintiffs were ordered to stop all work called for by the revised drawings because the work might not be done, and on September 10, 1948, were definitely informed that this part of the work would not be performed. This was predicated upon change order No. 3 and a stop order stopping all work on 16 towers, 12 of which were in the dredger area and four were not.

The evidence of the bureau engineers was to the effect that after the prime contract was executed they discovered that it would be dangerous to erect the 12 contemplated towers upon the foundation of the dredger tailings, so that deeper excavations removing the dredger tailings were required. There was much controversy between the parties and their witnesses as to the meaning of "overburden." Boomer testified that the term had no specialized significance in contracting terminology, but simply signified a stratum of material that was on top of another stratum. He conceded that the overburden of dredger tailings could be removed very cheaply by bulldozer and would not have to be removed by hand or truck-mounted tools, as much of the other work had to be done. Plaintiffs testified that, although most of the other excavation work had been done by hand tools or truck-mounted tools, some tailings existed in these other areas and had been removed by bulldozers with bureau permission. "Excavation, common, hand, for footings" was provided for in the prime contract at $9.00 per cubic yard, and at $8.10 per cubic yard in the subcontract, while, as already pointed out, the change order fixed defendant's allowance for overburden at but 75 cents per cubic yard, and Draper agreed with defendant to perform the work for 60 cents. Thus, of course, plaintiffs expected to make a large profit in the dredger tailings area so as to recoup losses suffered elsewhere.

After the work on the 16 towers had been stopped plaintiffs submitted to defendant claims for damages for breach of the contract. They first submitted statements claiming over $10,000 for out-of-pocket expenses incurred in reliance on the orders given by defendant to continue work in accordance with the revised plans except for the removal of the overburden, almost $70,000 for damages suffered because of the cancellation of the contract, which damages were computed by ascertaining the loss of anticipated profits on the entire job. A later demand increased the claim for these losses by several thousand dollars.

The reliance damages were incurred in preparing for performance of the revised work called for by change order No. 2 other than excavation in the form of purchase orders for additional steel necessitated by raising the height of the towers, for new required reinforcing steel and steel dowelling, for losses on a subcontract for furnishing and driving piling, for expenses on certain necessary trips, and for expenses in hiring new equipment. Plaintiffs, after the dispute in reference to the overburden had arisen, had received from defendant two letters dated July 15 and 21, 1948. These letters notified plaintiffs to proceed with all the work called for in the specifications found in change order No. 2 except the removal of the overburden.

After the bureau had eliminated the construction of the 16 towers, there was considerable correspondence between all the parties resulting in the bureau's finally making an award to defendant for plaintiffs of $3,152.71, representing certain materials ordered by plaintiffs in connection with the preparatory work and then sold to the bureau. The bureau disallowed several items, including the amount of a judgment a subcontractor had secured against plaintiffs by reason of the cancellation. This is the precise amount later allowed by the court to plaintiffs as a condition of denying the new trial. This sum was not paid to plaintiffs until the denial of the motion for a new trial.

At the trial plaintiffs, besides offering evidence as to loss of profits, showed substantial losses upon judgments obtained by subcontractors against them because the work on the towers in the disputed area was stopped. On this evidence the court denied a nonsuit, but later granted a directed verdict in favor of defendant. On the motion for a new trial the trial court did allow plaintiffs the $3,152.71 that had been awarded them by the bureau. The plaintiffs appealed.

Although the facts are quite complicated, the long record containing many facts not contained in the above summary, the primary issue presented on this appeal is whether there was any factual issue that ought to have been submitted to the jury. The basic arguments of respondent are that no factual issues were involved because, under the "protest" clause of the prime contract, appellants did not exhaust their administrative remedies granted to them by such clause, and, under the "disputes" clause, determinations of the contracting officer were made final. We do not agree with either of these contentions.

In order to decide the issues presented, reference must be again made to some of the provisions of the contracts already summarized. ██ We have no doubt at all, and in this connection agree with respondent, that the terms of the prime contract, including the conditions contained in the specifications, became, so far as applicable, part and parcel of the terms of the subcontract. The subcontract expressly provides that this shall be so. This being so, the provisions of the prime contract, as between appellants and respondent, are binding on the subcontractor and upon the original contractor. This means that respondent, as prime contractor, was legally bound to the subcontractor, among other things, to transmit and urge the subcontractor's claims before the bureau, and the subcontractor was bound to present his claims covered by the clause to the contractor in the fashion, so far as applicable, provided in the prime contract for presentation of claims by the contractor.

The prime contract authorized the contracting officer to settle "all disputes concerning questions of fact arising under this contract," and provided that on such questions his decision should be final and conclusive. The prime contract requires a protest to be made as to any "ruling of the contracting officer" deemed to be unfair. The question that is first presented is whether respondent and appellants complied with these protest provisions.

██ There is ample evidence to show that appellants lodged appropriate and numerous protests with respondent in reference to the problems arising out of the prohibition against excavating for the 12 towers in the dredger tailings area. From the time the bureau first announced its intention to reclassify the work in this area the appellants orally and by letter claimed the right to perform this work under their contract. Thus, as to this claim the jury could have found

that this amounted to a compliance by appellants with the protest clause of the prime contract. There is also evidence that indicates that respondent complied with his duties owed to appellants under this clause, at least to a certain extent. The record shows that respondent forwarded all claims of appellants to the bureau and urged such claims on behalf of appellants. But there is also evidence that respondent never filed with the bureau any claim, in his own right, that his contract covered the dredger tailings excavation. It might well be argued that this should have been done to fulfill respondent's obligations to appellants. At any rate, under the evidence, the jury could have found, had the case been submitted to it, that appellants had protested the bureau's decision sufficiently to the respondent to comply with the protest clause, and that if there was a failure to present such protests to the bureau as required by the prime contract it was the fault of the respondent. This is important because, if it had been found that appellants preserved their rights by a sufficient protest, the protest clause here involved provides that unless such protest is made to a ruling, the ruling shall be final and conclusive. Thus the protest clause does not purport to make the ruling of the contracting officer final if a protest is made.

Respondent cites *United States* v. *Moorman*, 338 U.S. 457 [70 S.Ct. 288, 94 L.Ed. 256], and *United States* v. *Wunderlich*, 342 U.S. 98 [72 S.Ct. 154, 96 L.Ed. 113], claiming that they establish the law to be that under such a protest clause decisions of the contracting officer are final on all questions whether protested or not, and whether legal or factual. But these cases did not involve the interpretation of clauses such as the one here exempting properly protested rulings from being final and conclusive. While these cases do declare a strong policy in favor of the finality of arbitral decisions, a policy also expressed by this court in *Crofoot* v. *Blair Holdings Corp.*, 119 Cal.App.2d 156 [260 P.2d 156], they are of no help in the present case where the clause cannot be interpreted to include protested rulings. (See for a discussion of the Moorman and Wunderlich cases, 39 Am.Bar Assn. Jour. 373.)

In the instant case there was conflicting evidence and inferences therefrom as to the meaning of "overburden" and of "common excavation," and over whether the latter included the former. The specifications define various types of excavation in paragraph 33 and then make "common excava-

tion'' the residual class. In paragraph 34 the excavation portions of paragraph 33 are made applicable to ''excavation in loose or unstable soil,'' and expressly made applicable to excavation by power-driven machinery other than augers. (See, also, for definition of ''excavation,'' *United States* v. *Blauner Const. Co.*, 37 F.Supp. 968.) Certainly it was a factual question as to whether the change order provided for or contemplated excavation of a type already committed to appellants under the ''common excavation'' clause of their contract. If the jury had found that the prime and subcontracts included the removal of the overburden, then the jury could have found that the issuance of change order No. 2, insofar as it attempted to change the method of payment for common excavation work on the 12 towers, was a breach of the contract by the bureau, and in turn by respondent.

It is true that appellants are trying to use change order No. 2 to secure damages for preparatory and other expenses incurred in trying to comply with its provisions as to the work other than excavation, and to renounce it as invalid insofar as excavation is concerned. This is a permissible approach. It seems quite clear that change order No. 2 is divisible. Insofar as it ordered a change in the type of work to be done on the 12 towers it merely provided for a needed change required by the nature of the work, and a change that was contemplated and provided for by the contract in its ''changes'' clauses. When the prime contract was executed there were no final plans for these towers. The evidence shows that the original plans called for spot excavation in the dredger tailings area, a method of excavation that would have required the towers to stand in rock and gravel. This, according to bureau engineers, would have been unsafe. The portion of the order raising the height of the towers and changing the amount of excavation called for was valid, and pursuant to the contract. But the portion of the order refusing to pay for this new work as provided in the contract was invalid, and could have been found to result in a breach of the contract. Of course, if the jury had found that change order No. 2 provided for excavation already included in the contract, appellants would have been entitled to perform and receive payment for all units necessary to the performance of a unit price contract. (*Callahan Const. Co.* v. *United States*, 91 Ct.Cl. 538; *McGaw* v. *Master Craft Homes*, 105 Cal.App.2d 304 [233 P.2d 185]; *Keystone Structural Co.* v. *Link-Belt Co.*, 265 F. 320.)

The contention of respondent that since appellants did not complete the excavation they could not receive payment for such work under specifications paragraph 34, and that payment of damages would amount to payment, is unsound. Damages for breach are, of course, not ''payment'' at all.

Thus the jury could have found that change order No. 2 was a breach, but a breach that appellants did not treat as a discharging breach, but in part, at least, tried to continue performance. The breach occurred prior to any attempt by the bureau to discontinue work in the area and the right to damages accrued before change order No. 3 and the stop order were issued.

But, says respondent, if this determination was factual, it is necessarily controlled by the ''disputes'' clause of the prime contract, making determinations of the contracting officer final and conclusive as to questions of fact. In other words, respondent contends that if the meaning and application of the ''common excavation'' clause is factual, it is governed by the ''disputes'' clause. It is urged that at most appellants had a right of ''equitable adjustment'' under article 3 of the prime contract. ▮ There can be no doubt at all that ''equitable adjustment'' is a question of fact upon which the administrative ruling is final. (*United States* v. *Callahan Walker Const. Co.*, 317 U.S. 56 [63 S.Ct. 113, 87 L.Ed. 49] ; *United States* v. *Blair*, 321 U.S. 730 [64 S.Ct. 820, 88 L.Ed. 1039].) Thus the pivotal question on this appeal is the extent and application of the ''disputes'' clause.

▮ Of course, by holding that the interpretation of the ''common excavation'' clause was one of fact for the jury, at first blush it would seem that such question was then one of fact within the meaning of the ''disputes'' clause. But, upon analysis, this conclusion does not follow. This is so because the cases interpreting federal contracts have clearly established that actions that amount to an actual breach of the contract are not covered by the ''disputes'' article. (*Callahan Const. Co.* v. *United States*, 91 Ct.Cl. 538 ; *Silberblatt & Lasker, Inc.* v. *United States*, 101 Ct.Cl. 54.) ▮ The Silberblatt case held, and properly so, that the contracting officer's authority is limited to disputes arising *under the contract* and does not extend to disputes over a *breach of the contract*. In *Continental Illinois Nat. Bank & T. Co.* v. *United States*, 101 F.Supp. 775, certiorari denied 343 U.S. 963 [72 S.Ct. 1057, 96 L.Ed. 1361], it was held that claims for unliquidated damages for breach of contract are not proper

subjects for departmental adjudications. (See, also, *Gemsco, Inc.* v. *United States,* 115 Ct.Cl. 209; *Peter Kiewit Sons' Co.* v. *United States,* 74 F.Supp. 165; *Blair* v. *United States,* 147 F.2d 840, rehearing granted 150 F.2d 676.) Thus, it must be held that the "disputes" clause was not applicable to questions arising out of a breach of contract. Thus, whether the bureau breached its contract by change order No. 2 was a question of fact for the jury, and a question not included within the "disputes" clause of the contract.

Now we turn to legal rights arising after change order No. 2 was issued. That change order only affected the 12 towers in the dredger tailings area. As to the four additional towers later affected by change order No. 3 and the stop order, change order No. 2 specifically recognized that appellants were entitled to do the excavation work on these towers at the unit prices quoted in the contract. Respondent admitted that, since these four towers were outside the dredger tailings area, the appellants were authorized by change order No. 2 to proceed with the excavation and conceded that his letter of authorization sent to Draper did not authorize Draper to conduct operations on these four towers. But the revised footings contained in the change order applied to these four towers. In other words, as to these four towers the jury could have found that appellants' right to excavate was enlarged and not removed by change order No. 2.

After the dispute had arisen by reason of change order No. 2, the bureau issued change order No. 3 stopping work on the 12 towers in the dredger tailings area and on the four additional towers. In other words, this change order deleted all 16 towers out of the total 225 estimated in the prime contract, that is, deleted about 1 mile of the 25-mile transmission line. Some four years after the events here occurred, this 1 mile was bridged with wooden poles. Now what was the legal effect of the attempted deletion of these 16 towers? Respondent claims that under the contract the bureau had the right to delete the 16 towers without violating the contract. The appellants claim the contrary. We agree with appellants.

Under the terms of the prime contract (article 3) the contracting officer was empowered to make "changes in the drawings and/or specifications of this contract and *within the general scope thereof.*" (Italics added.) Damages caused by such changes were to be settled by an "equitable adjustment" as to which the arbitral provisions of the contract applied, under the rule of the cases already cited. The specifi-

cations declared that the number of towers shown in the plans was a mere estimate, and that the government did not guarantee the construction of "all or any number of the towers listed." Thus, the question is presented whether the government had the legal right, as a matter of law, to delete the 16 towers, or whether such deletion could be found to be a breach of the contract.

We do not believe that the prime contract, as a matter of law, authorized the deletion of the 16 towers without liability except for an "equitable adjustment." There can be no doubt that the prime contract contemplated that some towers might be deleted during construction, and that such deletion could be made without liability. But the contract also contemplated and provided that the transmission line was to be constructed. It is a contract to construct a transmission line, not to construct about 225 towers. It is one thing to delete towers found to be unnecessary in the construction of the transmission line. It is quite another to delete an integral part of the work that results in the transmission line not being constructed. This 1-mile gap in the transmission line was not bridged until four years after this dispute arose, and then by a wooden pole line. The bureau section chief testified that the work was stopped in this area only because of the dispute with appellants.

■ Under the cases, if the contract imposes a duty on the government to complete the construction of the structure involved in the contract, a "changes" clause does not authorize the deletion of an integral part of the work. (*General Contracting & Const. Co.* v. *United States,* 84 Ct.Cl. 570; *Stapleton Const. Co.* v. *United States,* 92 Ct.Cl. 551; *Silberblatt & Lasker, Inc.* v. *United States,* 101 Ct.Cl. 54; *Del Balso Const. Corp.* v. *City of New York,* 252 App.Div. 683 [15 N.E.2d 559]; *Litchfield Const. Co.* v. *City of New York,* 244 N.Y. 251 [155 N.E. 116]; see first opinion in *Blair* v. *United States,* 147 F.2d 840; *Peter Kiewit Sons' Co.* v. *United States,* 74 F.Supp. 165; *Continental Illinois Nat. Bank & T. Co.* v. *United States,* 101 F.Supp. 755.) ■ These cases establish the law to be that under a changes clause the government has no power to change the essential nature or main purpose of the contract, but may only make changes incidental to the primary object of the contract. The change order under such clauses may not essentially alter the project contemplated by the contract.

This construction of such clauses is not only in accordance

with their obvious purpose, but is also strongly supported by public policy. If the government were empowered by such clauses to alter materially the object of the contract, after construction had started, all bidders would have to take such possibility into consideration and materially raise their bids in anticipation of such losses, thus increasing the cost of public works.

██ Thus the question is, did the deletion of the 16 towers materially alter the fundamental object of the contract, or merely provide for a deletion incidental to the primary object of the contract? This was a question of fact not covered by the "disputes" clause for reasons already discussed, and was a question of fact that should have been left to the jury. There was evidence that this deletion was a material alteration that defeated the object of the contract by prevention of the completion of the object of the contract. The deleted area was in the middle of the transmission line. This being so, it was error to have taken this issue from the jury.

There are many other points discussed by counsel. These need not be discussed. Enough has been said to demonstrate that prejudicial error was committed in granting the directed verdict, inasmuch as the trial court erroneously thus took from the jury the determination of fundamental factual issues.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied December 24, 1953, and respondent's petition for a hearing by the Supreme Court was denied January 20, 1954.