[Civ. No. 17349. First Dist., Div. One. Oct. 7, 1957.]

H. H. BOOMER, JR., et al., Respondents, v. GEORGE W. ABBETT et al., Appellants.

Melvin, Faulkner, Sheehan & Wiseman and Harold C. Faulkner for Appellants.

Richard E. Macey, Blewett, Blewett & Garretson and Erskine, Erskine & Tulley for Respondents.

BRAY, J.—This action, tried by the court without a jury, grew out of a subcontract entered into by plaintiff copartnership with defendant Abbett under a prime contract between said Abbett and the United States Bureau of Reclamation. The prime contract was to construct a transmission line in

northern California. The subcontract was to perform the excavation for and installation of the transmission line towers and certain other work.[1]

## QUESTION PRESENTED

Mainly, whether the excavation of the eight tower sites in the "dredger tailings" area was included in the prime contract and the subcontract.

## FACTS

The transmission line was to be approximately 25 miles long. Near the center of said line was a placer gold mining area known as the Clear Creek area, which was covered with dredger tailings consisting of loose rock, earth and some boulders. Plaintiffs claimed and the court found that the excavation of this area contemplated excavation of a type already committed to defendant under the "common excavation" clause of the prime contract. The bureau and defendant claimed otherwise.

The subcontract provided that the subcontractor was to perform all work as per schedule attached for excavation for 230 kilovolt transmission lines, Shasta Dam to Cottonwood-Gas Point Road in accordance with the general conditions of the prime contract and in accordance with its drawings and specifications. The schedule attached to the subcontract listed various items of work, including excavation items described as *"common, hand,* for footings," (emphasis added) estimated at a total of 1,420 cubic yards, "common, auger, for footings" estimated at 470 cubic yards and "rock for footings" estimated at 870 cubic yards, for which unit prices of $8.10, $6.30 and $45.90 respectively were provided. The contractor agreed to pay the subcontractor in accordance with these unit prices and the quantities as agreed upon between the bureau, general contractor and subcontractor. The prime contract provided that the quantities noted in the schedule were approximations for comparing bids, and no claim against the bureau "shall be made against the Government for excess or deficiency therein . . ." The prime contract listed 225 towers to be constructed but provided that this number was approximate only and "the Government does not guarantee the construction of all or any number of the towers listed."

Plaintiffs performed the excavation work for 206 towers, for

---

[1] For a detailed statement of the contracts, the work to be done and the action of the Bureau, see *Boomer* v. *Abbett,* 121 Cal.App.2d 449 [263 P.2d 476], where this court reversed a judgment for defendant granted on an instructed verdict.

which unit prices were fully paid. The common, hand, excavation exceeded the estimate by about 1,000 cubic yards. Plaintiffs actually received about $24,000 in excess of the contract price mentioned in plaintiffs' subcontract, including excavation work. The court found that at the time the prime contract and the subcontract were executed, the bureau and all parties knew that part of the excavation work required would be done in the Clear Creek area, and that certain towers would be erected, the excavation for the footings therefor would be made in dredger tailings, and that the bureau breached the prime contract in attempting as it did to reclassify said excavation work, by refusing to pay therefor at the unit prices called for common excavation work in the prime contract and the subcontract respectively, and by refusing to permit plaintiffs to do said excavation work in accordance with the provisions of both contracts; that defendant did not protest the actions of the bureau and therefore breached the subcontract. The court then found that plaintiffs had been damaged in the total sum of $71,404.45, of which plaintiffs were obligated to pay $5,557.12 to a certain concern to whom they had subcontracted a portion of the work to be done and the balance of which was the value of the time, effort and materials expended by plaintiffs in preparation for the work they were not permitted to perform, and loss of profits.

Some five months after the contracts were let, the bureau, which had not test drilled the dredger tailings area theretofore, did so. The tests showed that a considerable amount of excavation would be required. In the prime contract the bureau's contracting officer was entitled to "make changes in the drawings and/or specifications of this contract and within the general scope thereof." He also had the right to modify the contract "to provide for any increase or decrease of cost" resulting from "subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications . . ." Under these provisions and as the excavation in the dredger tailings area was completely dissimilar to the excavation elsewhere on the transmission lines, the bureau issued revised drawings and made change order Number 2. This ordered changes in the heights of 12 towers in the dredger area and in the nature and depth of the exca-

vations required. It provided that for excavating "overburden-dredger tailings for footings" of these 12 towers 75 cents per cubic yard would be paid. Thereupon defendant called for new bids on the excavation work covered by the change order. Plaintiffs refused to bid and this new work was awarded to one Draper at 60 cents per cubic yard. Plaintiffs asserted their right under their contract to undertake this newly specified excavation work at the prices set forth in the contract, and vigorously protested to defendant the bureau's actions, but expressed a willingness to perform the other new work called for in the change order at the new rates. Defendant conveyed these objections to the bureau officials but did not file a formal protest. When plaintiffs were notified that this work had been awarded to another, they protested by letter to defendant. Defendant ordered plaintiffs to perform according to the revised plans the work in this area other than the removal of the dredger tailings overburden. Plaintiffs proceeded to try to comply by purchasing materials and letting a subcontract. The bureau then issued change order Number 3, stopping all work of excavation for 16 towers, 12 of which were in the dredger tailings area and four were not. Plaintiffs were definitely informed that this part of the work would not be performed. The situation then existing as disclosed by the evidence is well expressed in our opinion in *Boomer* v. *Abbett, supra,* 121 Cal.App.2d at page 457: "The evidence of the bureau engineers was to the effect that after the prime contract was executed they discovered that it would be dangerous to erect the 12 contemplated towers upon the foundation of the dredger tailings, so that deeper excavations removing the dredger tailings were required. There was much controversy between the parties and their witnesses as to the meaning of 'overburden.' Boomer testified that the term had no specialized significance in contracting terminology, but simply signified a stratum of material that was on top of another stratum. He conceded that the overburden of dredger tailings could be removed very cheaply by bulldozer and would not have to be removed by hand or truck-mounted tools, as much of the other work had to be done. Plaintiffs testified that, although most of the other excavation work had been done by hand tools or truck-mounted tools, some tailings existed in these other areas and had been removed by bulldozers with bureau permission. 'Excavation, common, hand, for footings' was provided for in the prime contract at $9.00 per cubic yard,

and at \$8.10 per cubic yard in the subcontract, while, as already pointed out, the change order fixed defendant's allowance for overburden at but 75 cents per cubic yard, and Draper agreed with defendant to perform the work for 60 cents. Thus, of course, plaintiffs expected to make a large profit in the dredger tailings area so as to recoup losses suffered elsewhere.'' In the former case we discussed the issues that were presented and pointed out that most of them involved questions of fact upon which the evidence was conflicting, requiring resolving by the trier of fact. The same is true of the second trial. One of those issues (p. 460) was whether plaintiffs had protested the bureau's decision concerning the dredger tailing area sufficiently to defendant to comply with the protest clause of the contract, and that if there was a failure to present such protests to the bureau as required by the prime contract it was the fault of the defendant. The court found this issue against defendant. A second issue (pp. 460-461) arose out of the conflicting evidence and inferences therefrom as to the meaning of ''overburden'' and of ''common excavation'' and of whether the latter included the former. The court found that it did and that the change order provided for excavation of a type already committed to plaintiffs under the ''common excavation'' clause of their contract.[2]

Change order Number 2, insofar as it ordered a change in the type of work to be done on the 12 towers, merely provided for a needed change required by the nature of the work which change was contemplated and provided for by the contract in its ''changes'' clauses. ''When the prime contract was executed there were no final plans for these towers. The evidence shows that the original plans called for spot excavation in the dredger tailings area, a method of excavation that would have required the towers to stand in rock and gravel. This, according to bureau engineers, would have been unsafe. The portion of the order raising the height of the towers and changing the amount of excavation called for was valid, and pursuant to the contract. But the portion of the order refusing to pay for this new work as provided in the contract was invalid . . .'' and was a breach of the contract. (121

_____

[2] ''The specifications define various types of excavation in paragraph 33 and then make 'common excavation' the residual class. In paragraph 34 the excavation portions of paragraph 33 are made applicable to 'excavation in loose or unstable soil,' and expressly made applicable to excavation by power-driven machinery other than augers.'' (121 Cal. App.2d at pp. 460-461.)

Cal.App.2d at p. 461.) Moreover, as the court found that change order Number 2 provided for excavation already included in the contract, plaintiffs were entitled to perform and receive payment for all units necessary to the performance of a unit price contract of the 16 towers upon which change order Number 3 stopped work. Twelve towers were in and four towers were outside the dredger tailings area. As found in the former appeal, the cancellation of these 16 towers deleted about one mile of the 25-mile transmission line. Immediately this one mile was bridged with wooden poles. A third issue was whether this deletion as a matter of fact materially altered the fundamental object of the contract or merely provided for a deletion incidental to the primary object of the contract. The court found the former to be shown by the evidence.[3]

Paragraph 32 of the specifications provided: "The tower footings indicated are typical only and the final drawings will be furnished the contractor after award of contract. The final tower footings may be changed within reasonable limits in the final design; . . ." It further provided that the contractor would be entitled to no additional allowance above the unit prices bid in the schedule for tower foundations by reason of such changes.

Paragraph 33 of the specifications classified for payment "Rock excavation" as excavation of all solid rock in place which cannot be removed until loosened by blasting, barring or wedging and all boulders or detached pieces of solid rock of a certain volume. "Common excavation" was classified as "all material other than rock as defined above, including, but not restricted to earth, gravel . . . [and] all boulders or detached pieces of solid rock" less in volume than those above mentioned.

Paragraph 34 provided: "The use of power-driven excavation machinery, other than augers, may be used where hand-excavated type of footings are indicated on the drawing . . ."

Paragraph 34(c) provided: "During the progress of the work, it may be found necessary or desirable to vary the slopes or the dimensions of the excavations from those shown on the drawings, staked out, or otherwise established by the contracting officer, and the contractor shall be entitled to no additional allowances above the unit price . . ."

---

[3]In *Boomer* v. *Abbett, supra*, 121 Cal.2d 449, 464, we held "if the contract imposes a duty on the government to complete the construction of the structure involved in the contract, a 'changes' clause does not authorize the deletion of an integral part of the work. [Citations.]"

The bureau engineer testified that excavation work could be done with a bulldozer if the work was done according to the plans. Obviously if a bulldozer were used plaintiffs would be paid only for the material excavated within the pay lines. Plaintiffs actually used a bulldozer at times on the "hand dug" type of excavation at other tower footings and it was paid for as "hand dug" excavation. There was evidence that because the bureau considered that the excavating in the dredger tailings could be done by bulldozer, it was a different type of excavation and could be done at less cost than provided in the contract. It called the excavation work there "overburden dredger tailings" and contended it could be removed from the contract under the "changes" clause. While the evidence might have supported this contention, there is ample evidence to the contrary which fully supported the trial court's determination.

1. *Law of the Case.*

Plaintiffs contend that the previous decision of this court constituted a finding on the facts of the case and that the evidence should be examined only to determine if it is substantially the same as previously. Defendant contends to the contrary. In the prior decision this court discussed and determined that (1) as to the protest provisions of the contracts, there was presented a question of fact whether defendant and plaintiffs complied, and the jury could have found that plaintiffs protested sufficiently to comply with the protest clause and any failure was due to the fault of defendant (p. 459); (2) it was a jury question whether change order Number 2 provided for or contemplated excavation of a type already committed to plaintiffs under the "common excavation" clause of the contracts and, thus, the jury could have found the issuance of the change order to be a breach by the bureau and in turn by defendant (at p. 460); (3) the disputes clause did not extend to questions arising out of breach of contract (p. 462); (4) as to the effect of change order Number 3, it was a question of fact for the jury where there was evidence that this deletion was a material alteration that defeated the object of the contract by prevention of the completion of the object of the contract (p. 463). There was no material difference in the evidence presented at this trial from that at the former trial; hence that decision is the law of the case insofar as the points there discussed and determined. But

as pointed out in the decision, it was for the jury to determine conflicts in the evidence. Moreover, defendant has raised here additional points not considered there, such as the claim that plaintiffs proved no damage, that the trial judge prejudged the issues and that there was erroneous exclusion of evidence.

## 2. *Was There a Breach of the Subcontract?*

As we stated in the prior decision the contract was one to excavate for a transmission line and not to excavate for about 225 towers, that under the evidence it was for the jury to determine whether the deletion of the towers materially altered the fundamental object of the contract or merely provided for a deletion incidental to the contract's primary object. Coupled with this was the question as to whether the excavation for the towers was of a type already committed to plaintiff under the "common excavation" clause of the contract. The trier of the fact now has so determined. We said in the prior decision there was substantial evidence which would support such a finding. Likewise here there is such evidence. Hence the failure to permit plaintiffs to do this work under the contract constituted a breach of it. The dredger tailings could not be considered "unusual" since change order Number 2 specifically states that it was made pursuant to article 3 of the contract. In the prior decision we said (pp. 460-461) : "In the instant case there was conflicting evidence and inferences therefrom as to the meaning of 'overburden' and of 'common excavation,' and over whether the latter included the former. The specifications define various types of excavation in paragraph 33 and then make 'common excavation' the residual class. In paragraph 34 the excavation portions of paragraph 33 are made applicable to 'excavation in loose or unstable soil,' and expressly made applicable to excavation by power-driven machinery other than augers. (See also for definition of 'excavation,' *United States* v. *Blauner Const. Co.,* 37 F. Supp. 968.) Certainly it was a factual question as to whether the change order provided for or contemplated excavation of a type already committed to appellants under the 'common excavation' clause of their contract. If the jury had found that the prime and subcontracts included the removal of the overburden, then the jury could have found that the issuance of change order No. 2, insofar as it attempted to change the method of payment for common excavation work on the 12 towers, was a breach of the contract by the bureau, and in turn by respondent." The trier of the fact now so found.

In claiming change order Number 3 was not a breach, defendant principally relies upon the assertion that it did not alter the object of the subcontract. Defendant states that one line on wooden poles went into operation the day after work was completed and the other line on wooden poles was completed in May or June of 1949. However, this was only temporary as evidenced by the completion of the lines with steel towers in the dredger tailings area in 1951.

Applicable here is the language in *Hensler* v. *City of Los Angeles,* 124 Cal.App.2d 71, 79 [268 P.2d 12]: "The power vested in the engineer to effect changes in the quantities of the work is not so extensive as to enable him to abrogate or change the contract which the parties executed (*Brown* v. *Coffee,* 17 Cal.App. 381 [121 P. 309, 311]; *Monson* v. *Fischer,* 118 Cal.App. 503 [5 P.2d 628]), nor does it authorize defendant to employ such right to defeat the object of the contract which is reasonably deducible from its terms. The changes which may be ordered, when viewed against the background of the work described in the contract and the language used in the specifications, must clearly be directed either to the achievement of a more satisfactory improvement or the elimination of work not integrally necessary to the project."

Also applicable is the following from the previous decision (121 Cal.App.2d at p. 464): "Under the cases, if the contract imposes a duty on the government to complete the construction of the structure involved in the contract, a 'changes' clause does not authorize the deletion of an integral part of the work. [Citations.] These cases establish the law to be that under a changes clause the government has no power to change the essential nature or main purpose of the contract, but may only make changes incidental to the primary object of the contract. The change order under such clauses may not essentially alter the project contemplated by the contract."

Paragraph 11 of the specifications provides that the government will be relieved from all liability where Congress fails to appropriate the necessary money if the contract extends beyond the current fiscal year. Thomson, the contracting officer, testified that the reason for stopping work in the dredger tailing area was the dispute and that the contract was finally cancelled because the bureau was running out of money. However, there was no evidence that it was due to Congress' failure to appropriate money and the court found that the deletion was because of the dispute and in order to

avoid payment at the contract rates. As the trier of fact the court did not have to accept the statement of Thomson as to the reason for the deletion.

### 3. *Was Plaintiffs' Action Barred Because of Failure to Protest Change Order Number 3?*

Paragraph 13 of the specifications provides that if the contractor considers any ruling of the contracting officer or of the inspectors to be unfair he must ask in writing for written instructions or decision whereupon he shall proceed without delay to perform the work or conform to the ruling, and after receipt of the written instructions or decision he shall within 20 days file a written protest. Unless this is done the rulings or decisions of the contracting officer shall be final and conclusive.

 Since the paragraph above requires that the contractor continue to work while the protest is lodged, the paragraph is applicable to work ordered and not to cancellation of a part of the contract. Moreover, plaintiffs did submit to defendant a number of letters for cancellation charges including that for loss of profits. This could be considered a protest.

As to the defendant's contention that plaintiffs accepted the cancellation, the evidence is conflicting with the plaintiffs' denying that they so accepted. Thus, there was sufficient evidence upon which to conclude plaintiffs did not accept the cancellation.

Assuming that the plaintiffs failed to protest the cancellation under paragraph 13, they still would not be precluded from recovery. As stated in the prior appeal, "Thus the jury could have found that change order No. 2 was a breach . . . The breach occurred prior to any attempt by the bureau to discontinue work in the area and the right to damages accrued before change order No. 3 and the stop order were issued." (121 Cal.App.2d at 462.)

### 4. *Damages.*

 Defendant contends that plaintiffs did not prove damage, because it claims that plaintiffs had no prospective profits under the contract because they were losing money on the excavation outside the dredger tailings area. However, there was no evidence that plaintiffs would not have recouped their losses on the work they were prevented from doing. The evidence was to the contrary.

 Defendant contends that the allowance for loss of

profits of $69,000 on 10,000 yards of excavation is erroneous for the reason that when the towers were erected in 1951, the actual excavation amounted to only 495 yards. However, plaintiffs' rights became fixed under the contract when it was breached and cannot be measured by a later contract entered into by the bureau. The allowance was based upon the amount of excavation in the dredger tailings area shown by change order Number 2, which for the first time determined the excavation required for the towers in that area. The contract provided for excavation in that area but the amount was to be, and was, determined later. All footings were required to go into the undisturbed soil. In this area that required much more excavation than in the other areas. Plaintiffs are entitled to the loss of profits they would have made had not change order Number 3 deleted the work. See *McConnell* v. *Corona City Water Co.*, 149 Cal. 60 [85 P. 929, 8 L.R.A.N.S. 1171]; *Hensler* v. *City of Los Angeles, supra,* 124 Cal.App. 2d 71.

### 5. *Exclusion of Evidence.*

The court sustained objections to questions asked civil engineer Kuykendall whether any excavation described in the detail drawings called for use of a bulldozer or dragline, whether any excavation could be done by such machines without disturbing the walls of the neat lines required, whether he would have permitted such equipment to be used for the "hand dug" excavations, and also how the excavation would have been made in the dredger tailings area if no change order had been issued. Likewise, an objection was sustained to a question asked Thomson as to whether he ever authorized any excavation on the other 206 towers to be made by a bulldozer. We can see no error in this ruling. The questions' called for the witnesses' interpretation of the contract. Moreover, the contract provided that equipment of that kind could be used, and there was evidence that such equipment actually was used in the areas to be "hand dug."

### 6. *Did the Trial Judge Prevent a Fair Trial?*

Defendant contends. that the trial judge prejudged the issues. The judge from time to time commented on the evidence and on occasion indicated that he disbelieved certain witnesses. The statements were made in the discussions between court and counsel in rulings and in determining the position of counsel on various issues. There being no jury, this was his right. On several occasions he pointed out that

he was not ruling on the outcome of the litigation. While there may have been some injudicious remarks, a reading of the entire transcript fails to support defendant's charges. No objections were made at the trial to the judge's remarks. The judge's statements were of the type set forth in *Ries* v. *Reinard*, 47 Cal.App.2d 116, 120 [117 P.2d 386] : "It is not unusual nor is it improper for the trial judge in passing upon questions of law relative to the admissibility of evidence, motions to strike, etc., to announce for the guidance of counsel the reasons upon which he predicates his rulings, although by so doing he necessarily expresses an opinion upon the evidence which has been already introduced. Such expressions of opinion are not intended to be nor are they final expressions upon the ultimate facts to be found in the cause then pending, but are mere expressions of tentative opinions for the benefit and guidance of counsel."

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied November 6, 1957, and appellants' petition for a hearing by the Supreme Court was denied December 4, 1957.