The Kinser Construction Company, Appellant, *v.* The
State of New York, Respondent.

Contract — analysis and construction of contract for construct-
ing part of barge canal — changes in plans required by unfore-
seen conditions rendering completion of work under original
plans impossible — when contractor cannot recover profits lost
by such changes.

1. The parties entered into a written agreement for the construc-
tion by the claimant of about three and three-fourths miles of the
new Champlain canal and payment by the state for work and
materials at certain unit prices for specified items in various install-
ments as the work progressed, ten per cent being retained until
the completion of the contract, which contract contained the fol-
lowing provision: "7. It is mutually agreed that the state reserves
the right until the final completion and acceptance of the work,
to make such additions to or deductions from such work or changes
in the plans and specifications covering the work as may be neces-
sary and the contract shall not be invalidated thereby and no claim
shall be made by the contractor for any loss of profits because of any
such change or by reason of any variation between the quantities of
the approximate estimate and the quantities of the work as done."
The contractor commenced work and had practically finished and
had been nearly paid for a substantial part of the contract, when a
stop order was issued by the state suspending a part of the work until
new plans could be perfected, and subsequently the state issued and
submitted to the contractor for its approval alteration orders which
involved a change in the plans covering the work embraced in the
contract eliminating therefrom about one-half mile out of the total
of about three and three-fourths miles. Changes were also made
in the estimates of quantities, but the same unit measure was
retained. The claimant refused to comply with the alteration
orders and notified the officers in charge that it treated the same
as a violation of the contract, and that it would hold the state
liable for all damages caused thereby.

The items of the claim as specified in the notice filed included,
among other things, loss of profits for work not done owing to the
alleged breach and damages for delay. The court found that it
was impossible to construct one of the locks as planned at said loca-
tion or to secure a suitable site within the limits of claimant's con-
tract; that it was impracticable to construct the remainder of the

work within the limits of the stop order as provided by the original plans and specifications by reason of the slippery and unstable condition of the subsoil, which was unknown to both parties; that conditions were such as rendered the performance of the contract as planned impossible and made necessary substantial changes in the nature and cost of the contract and substantially affected the work remaining under the contract within the limits of the stop order. The change was not made because it was cheaper or better, but because it was necessary. *Held,* that the seventh clause of the contract permits the state not only to make such additions to or deductions from the work, but also to make such changes in the plans and specifications covering the work as may at any time be necessary, without rendering the contract invalid or subjecting the state to claims for loss of profits by the contractor; that when performance became impossible owing to conditions unforeseen by either party, necessity for the changes arose, and those made were within the provisions of the contract and the power expressly reserved by the state, and hence the claimant was not entitled to prospective profits and cannot recover damages for the alleged breach of the contract by the state.

*Kinser Construction Co.* v. *State of New York,* 145 App. Div. 41, affirmed.

(Argued January 24, 1912; decided February 13, 1912.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered May 15, 1911, affirming a judgment in favor of plaintiff entered upon an award of the Court of Claims.

On the 31st of December, 1909, the Kinser Construction Company filed with the clerk of the Court of Claims a claim against the state of New York for $370,525.41, alleging that it had sustained damages to that amount through the breach by the state of a contract entered into by the parties for the improvement of a part of the Champlain canal under certain statutes relating to the subject known as the Barge Canal Acts. The items of the claim as specified in the notice filed include the value of work done but not paid for; loss of profits for work not done owing to the alleged breach; damages for delay; the amount reserved by the state on estimates made for

the purpose of payment as the work progressed and some other items of slight importance.

The state filed a counterclaim or set off amounting to $13,280.01 for work done by its officers in order to put the canal in a navigable condition after a large quantity of earth had slid therein from its natural position during the progress of the work done by the claimant under its contract.

On the trial before the Court of Claims much oral testimony was given, many exhibits received in evidence, elaborate findings made, an opinion written by each judge of the court, and a judgment rendered against the state for the sum of $77,425.46. No part of the counterclaim of the state was allowed. The claimant appealed to the Appellate Division and, in its notice of appeal, alleged "that the same is taken upon questions of law and fact, because of the insufficiency of the judgment, because the said judgment is against the evidence, contrary to law and not sustained by any evidence, and because of errors in the admission and exclusion of evidence." The state did not appeal. The Appellate Division unanimously affirmed the judgment, and thereupon the claimant appealed to this court, alleging as the grounds of its appeal those specified in its notice of appeal from the judgment of the Court of Claims.

The trial court found the following facts in substance: On the 23rd of November, 1906, the parties entered into a written agreement known as contract number seven for the construction by the claimant of "the improvement of the Champlain Canal between the south end of contract Number 25 at Dunham's Basin Road and the Hudson River at Fort Edward," in accordance with certain plans and specifications which formed part of the contract. This involved the construction by the claimant of 3.76 miles of the new Champlain canal and payment to it by the state for work and materials at certain unit prices for specified items in various installments as the

work progressed, ten per cent being retained until the completion of the contract. Among other provisions were the following:

"7. It is mutually agreed that the State reserves the right until the final completion and acceptance of the work, to make such additions to or deductions from such work or changes in the plans and specifications covering the work as may be necessary and the contract shall not be invalidated thereby and no claim shall be made by the contractor for any loss of profits because of any such change or by reason of any variation between the quantities of the approximate estimate and the quantities of the work as done."

"11. The contractor agrees that he has satisfied himself by his own investigation and research regarding all the conditions affecting the work to be done and labor and material needed, and that his conclusion to execute this contract is based on such investigation and research and not on the estimate of the quantities or other information prepared by the State Engineer, and that he shall make no claim against the State because any of the estimates, tests or representations of any kind affecting the work made by any officer or agent of the State may prove to be in any respect erroneous."

"24. The contractor further agrees that all damages of whatever nature resulting from the work, or resulting to the work, during its progress, from whatever cause, shall be borne and sustained by the contractor; that all work shall be solely at the contractor's risk until it has been finally inspected and accepted by the State Engineer and Superintendent of Public Works.   *   *   *."

The contractor commenced work in April, 1907, and had practically finished and had been nearly paid for a substantial part of the contract, when in November, 1908, further performance was stopped by natural conditions as hereinafter stated. Various changes and additions were made from time to time as the work progressed as to

which little or no complaint is now made. On the 6th of November, 1908, while the contractor was excavating at the location of lock No. 7, a portion of the adjacent material fell back into the excavation, but it was removed by the contractor at the expense of the state. Thereupon at the suggestion of the contractor and upon its written statement that "the material is a soft greasy blue clay," the specifications for the grade at that point were changed from a slope of "one on one" to a slope of "one on three," which flattened the slope by reducing the angle thereof to one-third of its former slant. On the 15th of November, 1908, while the contractor was still excavating at the same location, a second slide occurred whereby a mass of material nearly six hundred feet long and over ninety feet wide was thrown into the excavation and beyond it to the middle of the old Champlain canal which adjoined the channel of the new canal. The trial court found that the material to be excavated at this point was a slippery greasy clay which extended to a depth of forty feet or more below the lowest point excavated by the contractor at the time of the slide and that material of substantially the same character extended from that point to the Hudson river where the claimant's contract ended. An eminent engineer called by the contractor testified that during his experience of thirty-seven years in many different states and on all kinds of work, this material "was the finest, softest clay that ever came to my notice and it was so fine I often said if they put a little tar in it they could sell it for axle grease, it was so much like grease." There was no conflict in the evidence as to the nature of the soil but the witnesses differed as to the depth of the slippery material. No one placed it at less than forty feet below the bottom of the excavation as made and the president of the contractor put it at about seventy-five feet in the aggregate. According to the original plan a heavy concrete lock was to be erected upon timber piles

twenty feet long driven into the earth, which, when the contract was made, was regarded by both parties as solid, but which was found later to be mobile beyond precedent. A huge foundation for the lock was to be built, and the lock itself was to be four hundred feet in length, forty-nine feet wide, with two heavy concrete side walls twenty-five feet high, eighteen feet thick at the base and about eight feet thick at the top. The weight of the lock when filled with water would have been immense.

On the 18th of December, 1909, a stop order was issued by the state suspending the work south of station 1217 until new plans could be perfected. The entire contract included stations 1041 to 1245, and the work north of station 1217 was not affected by the stop order. The contractor had made the most of the earth excavation north of station 1217, but a substantial part of the rock excavation north of that point remained undone, and the price for both kinds of work was the same sum per cubic yard.

The court found in terms that "the character of the material encountered in the excavation for lock No. 7, where the cave-in occurred, was such that it was impossible to construct the lock as planned at said location or to secure a suitable site within the limits of claimant's contract. It was impracticable to construct the remainder of the work within the limits of the stop order as provided by the original plans and specifications, and by reason of the condition of the soil within the limits of the stop order. To secure a practical and suitable site for said lock it became necessary for the state to change the location of said lock and to exclude it entirely from claimant's contract. The change in the location of said lock and character of the sub-soil discovered in the remainder of said contract made the other changes necessary in the specifications for the completion of said work. In the excavation for lock No. 7 conditions of soil were found and also in the remainder of the work, which ren-

dered the performance of the contract as planned impossible and made necessary substantial changes in the nature and cost of the contract and substantially affected the work remaining under the contract within the limits of the stop order." The change was not made because it was cheaper or better, but because it was necessary, as the court found.

The stop order remained in force until June, 1909, when the state issued and submitted to the contractor for its approval alteration orders known as Nos. 6 and 7. These orders involved a change in the plans covering the work embraced in the contract whereby twenty sheets out of nearly one hundred were wholly eliminated from the existing plans and ten sheets were added thereto. The elimination took from the work about one-half mile out of the total of three and three-fourths miles. Changes were also made in the estimates of quantities, but the same unit measure was retained. An elaborate description of the changes was given, the various objects thereof stated and a full explanation made. The alteration was approved by the superintendent of public works, the state engineer and the canal board, and about the middle of June, 1909, the contractor, who had not assented to the change, was ordered and directed to proceed with the work in accordance with the plans and specifications as thus changed. The order involved the elimination of work to the amount of $398,612 according to the original estimates, and substituted other and different work, amounting to $153,584.50, making an actual change in the amount of the work of $245,027.50. On the 1st of July, 1909, the claimant refused to comply with the alteration orders and notified the officers in charge that it treated the same as a violation of the contract, and that it would hold the state liable for all damages caused thereby. No more work was done under said contract by the contractor, and the state readvertised and relet the work to other parties. When

the contractors stopped work on the 24th of December, 1908, two locks and quite an extent of the canal had been completed, but there remained work unperformed amounting to $521,954.42. After the change was made there remained unperformed of the original work $192,169.59 in amount. The contractor had been paid the sum of $340,785 on monthly estimates, and there was a balance of $41,718.63 unpaid on the work done at the contract prices. There had also been furnished under the contract material not paid for amounting to $19,425.53. Both of these items were allowed by the Court of Claims, which also allowed two items of minor importance and the sum of $9,281.29 for maintenance of the plant in idleness during the time the stop order was in force, but no allowance was made for prospective profits, amounting, as claimed by the contractors, to $210,490.84, and, as claimed by the state, to $134,562.18. It is conceded that the profits on the work done and paid for were very large, and apparently they would have been increased if the contractor had seen fit to go on with the work unaffected by the change, amounting to nearly $200,000.

The court found as conclusions of law that the contractor was not liable for the expense of restoring the navigation of the old Champlain canal resulting from the slide of November 15th, 1908; that the contract between the parties became terminated by the natural conditions of soil which made the construction of lock No. 7 as planned impossible and the execution and completion of the remainder of the contract within the stop order impracticable without fault of either party. The remaining conclusions of law allowed the sums already mentioned, amounting with interest on a part thereof to $77,425.46, for which judgment was rendered against the state.

*L. Laflin Kellogg* and *Franklin Nevius* for appellant. The claimant was entitled to recover from the defendant, the state of New York, the legal damages

which flowed from the breach of contract upon the part of the state of New York in taking away from the claimant a material and integral portion of the work called for under the contract and thus preventing the full performance thereof. Those legal damages were the amount of moneys earned and materials furnished under the contract and profits upon that portion of the contract which was taken away. (*Jones* v. *Judd*, 4 N. Y. 411; *Clark* v. *Mayor, etc.*, 4 N. Y. 338; *W. C. & Mfg. Co.* v. *Holbrook*, 118 N. Y. 586; *Wharton* v. *Winch*, 140 N. Y. 289; *Byron* v. *Low*, 109 N. Y. 291; *Gearty* v. *Mayor, etc.*, 171 N. Y. 61; *Danolds* v. *State*, 89 N. Y. 36; *McMaster* v. *State*, 108 N. Y. 542; *People* v. *Stevens*, 71 N. Y. 549.) The order of the state called for a fundamental change of construction which constituted a breach of contract. (*Gage* v. *Mayor, etc.*, 110 App. Div. 403; *McMaster* v. *State*, 108 N. Y. 542; *County of Cook* v. *Harms*, 108 Ill. 151; *Salt Lake City* v. *Smith*, 104 Fed. Rep. 457; *Nat. Contracting Co.* v. *H. R. W. P. Co.*, 192 N. Y. 209; *Gillet* v. *Bank of America*, 160 N. Y. 549.) Even impossibility of performance does not relieve the party originally obligated. (*Harmony* v. *Bingham*, 12 N. Y. 107; *Thompkins* v. *Dudley*, 25 N. Y. 272; *Wheeler* v. *C. M. L. Ins. Co.*, 82 N. Y. 543; *Booth* v. *S. D. R. M. Co.*, 60 N. Y. 487.) The state having contracted with the complainant to perform the work agreed to according to certain plans and specifications prepared by the state, became thereby the guarantor of the efficiency of its own plans and liable for damages for any defect therein or failure thereof. (*M. F. S. Co.* v. *Mayor, etc.*, 160 N. Y. 72; *C.-H. Realty Co.* v. *City of Albany*, 134 App. Div. 722; *Byron* v. *Mayor, etc.*, 22 J. & S. 411.)

*Thomas Carmody, Attorney-General* (*J. A. Kellogg* of counsel), for respondent. The action taken by the state authorities in making the change of plan shown by the alteration order dated June 12, 1909, did not constitute a

breach of the contract giving the claimant a right to recover damages. (*Woodruff* v. *Woodruff*, 52 N. Y. 53; *Daly* v. *B. T. Ry. Co.*, 129 Fed. Rep. 513; *Kingsley* v. *City of Brooklyn*, 78 N. Y. 200; *Jacquin* v. *Boutard*, 89 Hun, 437; 157 N. Y. 686; *Sattler* v. *Hallock*, 160 N. Y. 291; *Seymour* v. *Warren*, 179 N. Y. 1; *Chicago* v. *Sheldon*, 76 U. S. 50; *Topliff* v. *Topliff*, 122 U. S. 121; *Williams* v. *S. F. Ry. Co.*, 153 Mo. 487.) The decision of the Court of Claims to the effect that the contract was terminated on account of the impossibility of its performance, thereby permitting the claimant to recover for work actually done, was the most favorable theory that could have been invoked in behalf of the claimant under the conditions. (*Stewart* v. *Stone*, 127 N. Y. 500; *Lorillard* v. *Clyde*, 142 N. Y. 456; *Dolan* v. *Rogers*, 149 N. Y. 489; *Herter* v. *Mullen*, 159 N. Y. 28; *B. & L. L. Co.* v. *B. L. & T. Co.*, 165 N. Y. 247; *Larabee Co.* v. *Crossman*, 100 App. Div. 499; 184 N. Y. 586; *Whipple* v. *L. B. S. R. Co.*, 63 Misc. Rep. 363.)

Vann, J. This appeal comes to us on the findings made by the Court of Claims and unanimously affirmed by the Appellate Division, so that the facts are settled beyond our power of review. The main question presented for decision is whether the facts thus finally resolved sustain the conclusions of law found by the trial court. That question depends on the meaning of the seventh clause of the contract, when read in connection with the context and construed in the light of the circumstances surrounding the parties when they entered into the agreement. It will be convenient for any one who reads this opinion to have that clause directly before him as he considers our views upon the subject and, hence, we quote it again as follows : "7. It is mutually agreed that the State reserves the right until the final completion and acceptance of the work, to make such additions to or deductions from such work or changes in the plans and

specifications covering the work, as may be necessary, and the contract shall not be invalidated thereby, and no claim shall be made by the contractors for any loss of profits because of any such change or by reason of any variation between the quantities of the approximate estimate and the quantities of the work as done."

This clause permits the state not only to make such additions to or deductions from the work, but also to make such changes in the plans and specifications covering the work as may at any time be necessary, without rendering the contract invalid or subjecting the state to claims for loss of profits by the contractor. (*Clark* v. *Mayor, etc., of N. Y.*, 4 N. Y. 338; *Kingsley* v. *City of Brooklyn*, 78 N. Y. 200.) No limitation other than necessity is placed upon the right to make additions, deductions and changes in the work, plans and specifications. Necessity is the sole basis and standard for the protection of both parties. On the one hand, it protects the contractor from arbitrary, capricious or unreasonable action by public officers, and on the other it protects the state from unforeseen conditions, which would render the work as originally planned impossible of performance. The necessity need not be absolute, but it must be reasonable, for the law writes the word " reasonably " before the word "necessary" in the contract as unavoidably within the contemplation of the parties, when the extent of the work is considered. (*Jerome* v. *Ross*, 7 Johns. Ch. 315, 340.) Reasonable necessity did not require that it should be absolutely or physically impossible to build the lock on the old location, for, assuming that it was an engineering possibility, if the expense involved was so enormous as to make it impracticable, performance was impossible within the meaning of the contract.

The surrounding circumstances show that the word "necessary" was used to fulfill a purpose of the highest importance to the state. The contractor agreed that it had satisfied itself by its own investigation and research

as to all the conditions affecting the work to be done; that its conclusion to execute the contract was based on such investigation and research and that it would make no claim against the state because of any estimate, *test* or representation of any kind affecting the work made by any officer or agent of the state which might prove to be in any respect erroneous. We may assume from this that the state itself had made investigations and tests along the line of the work as to the nature of the soil to be excavated as well as the nature of the soil upon which completed structures were to rest. Both parties, however, were mistaken as to the physical conditions affecting the work at lock No. 7 and they ultimately realized that those conditions were such as to prevent performance of the contract they had made according to the original plan. The plan was not defective, but the earth gave way and thus a situation was created which neither party had foreseen. That situation shows the exact object of the clause in question in view of the surrounding circumstances known to both parties when they made the contract.

The state was engaged in a work of such magnitude as to be without precedent in its own history or in the history of any other state. Nearly a century before it had built the Erie canal at a cost of about $7,000,000 with capacity to carry boats of seventy-five tons burden. Years later it had enlarged the canal so that it could carry boats of over two hundred tons, but at last it was about to construct a great waterway to carry boats of more than three thousand tons and at an expense of more than $100,000,000. It extended from Lake Erie to the Hudson river with one branch from Three River Point to Lake Ontario, another from the Hudson river at Waterford to Lake Champlain and a third to connect with the Seneca and Cayuga lakes, making a total of more than four hundred and fifty miles.

In laying out a line of canal engineers have less lati-

tude than in laying out the route of a road or a railway, because water runs down hill and gradients are not possible.   Hence the route to a great extent depends on natural conditions.   Among the requirements in the construction of the barge canal were many locks to be operated by hydraulic or electric power and each between three and four hundred feet long with lifts ranging from six to forty feet; over thirty dams, some of them nearly two thousand feet in length and over forty feet in height; reservoirs of immense size with a holding capacity measured only by billions of cubic feet of water and other huge structures too numerous to mention.   According to the statutes providing for the work, which are referred to in the contract and notice of claim, four rivers were to be "canalized" so as to make a minimum bottom width of two hundred feet, with short sections of wholly new construction across bends and long sections of wholly new construction after the canal leaves the rivers and continues on through the unbroken country.   Three lakes were to be utilized; harbors and basins were to be built ranging from 1,200 to 1,500 feet in length and a vast amount of other work done.   Within three months after the first bonds were sold in order to raise the money needed, the superintendent of public works and the state engineer were commanded to proceed with the improvement, to acquire the necessary land, notify the landowners, make and file surveys and maps, prepare plans and specifications for every section of the work, make detailed estimates of quantity and cost, and "ascertain with all practicable accuracy the quantity of embankment, excavation and masonry, the quantity and quality of all materials to be used and all other items of work to be placed under contract."   The extent of the work involved in making the maps and plans for the entire length of the canal and its branches is suggested by those put in evidence on the trial and furnished by the parties for our use on this review.   Although prepared for less

than four miles of the canal and less than one per cent of the entire work, they cover nearly six hundred square feet of drawing surface, embracing general outlines, minute details and all that was required, not only for excavation and embankment, but also for the construction of locks, power plants, spillways, bridges and the like.

It is obvious that in a work of this magnitude the highest engineering skill, even when exercised with the utmost care, could not learn in advance all the physical conditions to be met with during the progress of the work. Those to whom the mammoth undertaking was intrusted, even with the aid of the most expert engineers, could not find in all places throughout the long line of operations what nature had placed beneath the surface of the earth in the form of obstacles to construction which could not be overcome. Alterations and changes, many slight and some substantial, would almost inevitably be required at various points in a work of such extent. Common prudence on the part of those in charge would compel them to make provision for such contingencies as could not be foreseen with ordinary care and prudence. This was the object of the clause in question, which should be so construed as to effect its important purpose. Bidders were bound to take notice that the state reserved the right to make additions and deductions in the work and changes in the plans and specifications covering the work, with no right on their part to claim damages for loss of profits on account thereof. Minor changes were certain and of slight importance. Radical changes might or might not be made, depending upon necessity, and the bidder ran his risk and doubtless increased his bid on account of the risk. In this case the result is harsh in its effect, not owing to absolute loss for which the judgment provides, but to the loss of profits that might have been made. This evil is less serious than to force the state to pay

a large sum as prospective profits upon work for the public that was not done because it could not be done.   The trial court found every fact necessary to authorize the action taken by the state in making the changes.   It found that it was impossible to construct lock number seven as planned at the location selected or to secure a suitable site within the sections covered by the claimant's contract.   It was necessary, as the court further found, to change the location of that lock and to exclude it entirely from the contract of the claimant, because the character of the sub-soil rendered performance of the contract as planned impossible.   When performance became impossible owing to conditions unforeseen by either party, necessity for the changes arose, and those made were within the provisions of the contract and the power expressly reserved by the state.

We have examined the authorities cited by the learned counsel for the claimant, but find none when carefully read which decide anything in conflict with the views here expressed, whatever may have been said as the personal view of the judge writing the opinion.   It is one thing to build a single structure like the dam across the Hudson river near Palmer's Falls and quite another to create a body of water extending across the state upon which barges can carry the commerce of the great lakes in loads of more than 3,000 tons each.   (*National Contracting Co.* v. *Hudson River Water Power Co.*, 192 N. Y. 209.)

The case cited, which is the chief reliance of the appellant, involved a contract, not with the state, but between private parties, to build a single dam, while the contract in question covers but a small part of a great work.   There was no provision for a change in case of necessity, although there was power to make alterations without liability for anticipated profits.   A change from a masonry dam with no earth called for, to a dam essentially of earth with comparatively little masonry, made

for no reason but to save expense, was held to destroy the essential identity of the thing contracted for and to constitute a breach of the contract. There the change was made under a power reserved of narrower scope and simply because the change would make construction cheaper, but here it was made not because it was cheaper but because it was absolutely necessary, as otherwise the canal could not have been constructed at the point involved. There also the contractor was to be paid in bonds secured by a mortgage on the structure itself, and if the change proved a failure the value of the bonds would be impaired.

*McMaster* v. *State of New York* (108 N. Y. 542) is also relied upon by the claimant, but there was no necessity for the change of plans in that case and the change made was arbitrary, radical and subversive of the thing to be done. There was no reason for it except that the new construction would be cheaper.

An authority much more analogous to the case in hand, both in its facts and in the principle involved, lends strong support to the conclusion we have reached. (*Kingsley* v. *City of Brooklyn*, 78 N. Y. 200, 208.)

The appellant claims that the state guaranteed its plan, but assuming, without deciding, that this is true, the trouble was not with the plan but with the earth, which refused the support relied upon by both parties, the one as much as the other. When the earth gave way and there was no adequate support for the structure to be built upon it, a contingency arose which authorized the state to exercise its reserved power. It was the same in effect as if an earthquake had utterly destroyed the foundation on which the lock was to rest. The defect was caused by nature, not by man.

According to the facts found by the trial court and unanimously approved by the Appellate Division there was no breach of contract by the state, and the claimant was not entitled to prospective profits nor to a judgment

more favorable in any respect than the one rendered by the Court of Claims.

More might be said; but, in view of the careful opinions written in both of the courts below, I regard further discussion as unnecessary. I recommend that the judgment appealed from be affirmed, with costs.

CULLEN, Ch. J., GRAY, HAIGHT, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur.

Judgment affirmed.