[Civ. No. 19810. Second Dist., Div. Two. Mar. 23, 1954.]

R. R. HENSLER, Respondent, v. THE CITY OF LOS ANGELES (a Corporation), Appellant.

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, and Alfred E. Rogers, Deputy City Attorney, for Appellant.

Irvin Grant for Respondent.

FOX, J.—Defendant appeals from a judgment awarding damages for breach of contract and reimbursing plaintiff for expenditures incident to a suspension of work ordered by defendant.

Plaintiff, a licensed general contractor, entered into a contract with the city of Los Angeles on April 12, 1951, whereby he undertook "to furnish all equipment, material and labor necessary for the construction of, and to construct Stage 1 Runways and Taxiways and appurtenant work at the Los Angeles International Airport." The total agreement between the parties embraced the following documents, which had been furnished to plaintiff in making his bid and which were incorporated by reference in the contract of April 12, 1951:

(a) Published notice inviting bids; (b) standard specifications for construction of airports; (c) special provisions designated as Specification No. 5021; (d) the contractor's proposal; (e) bonds; and (f) plans for the Work.

The work to be performed by plaintiff was broken down into a detailed set of items embodied in a bid schedule which was contained in the contractor's proposal, and incorporated into the contract. Each item related to an estimated quantity of work, payment for which was based upon unit prices for the various items of work.

At the time the agreement was executed, automobile traffic which ordinarily proceeded on that part of Sepulveda Boulevard which then bordered one side of the airport had been rerouted to a temporary by-pass road running along the westerly end of the then existing runways. This by-pass road traversed an area which was ultimately to be a part of the airport. The contract included the installation of runways and taxiways over the area occupied by the temporary road, removal of the by-pass, and certain appurtenant work. Both parties knew that the completion of the work would require a discontinuance of traffic over the by-pass and knew that a new by-pass road was being constructed by a different contractor further to the west, which was scheduled for completion by June 30, 1951. The special provisions set up two priorities for plaintiff's construction work. The first priority, to be completed by June 30, 1951, consisted substantially of the performance of all the work exclusive of the removal of the existing by-pass road and other construction work in the area occupied by that road. The entire job was to be finished by September 1, 1951.

Plaintiff commenced work and progressed with his operations until August 20, 1951, at which time defendant issued change order No. 8, deleting certain portions of the work to be performed under the contract. The work so deleted consisted of items relating to the removal of the Sepulveda by-pass road and the installation of appurtenant work, as well as construction work on the runways and taxiways to be installed in the area adjacent to the by-pass road. Defendant ordered these deletions when it discovered that because of the refusal of the Division of Highways of the State of California to grant its consent for the connection of the new by-pass road with existent highways, it would be unable to remove traffic from the Sepulveda by-pass road and so make available to plaintiff the job site contemplated by the contract. As a result of these deletions, the work called for by the agreement remained in an unfinished condition. The new by-pass road was placed in operation several months later, following which defendant let a contract to another contractor for the performance of substantially all of the work which had been deleted from plaintiff's contract.

The record also shows that while plaintiff was engaged in performance of the work, he was orally notified on May 31, 1951, to cease the mixing operations then taking place. A confirmatory written order was issued the following day. The stop

order was released on June 5, 1951, but due to the time required for realignment of the personnel, material and equipment, work was not resumed until June 7, 1951. Plaintiff had received no prior warning that work would be halted, nor was he informed as to the reason for the stop order during the cessation of work.

Plaintiff's complaint states two causes of action. In brief, the first alleges that the defendant's deletion from the contract of the described items of work upon finding that it could not reroute traffic from the Sepulveda by-pass constituted a breach of contract by which he sustained damages. The second cause of action is based on a claim that he was entitled to be reimbursed for the actual money expended on the job during the period he ceased work pursuant to defendant's stop order.

The court gave judgment in the sum of $38,421.30 on plaintiff's first cause of action. The court found that the agreement between the parties contemplated the construction of a completed work of improvement and that the omissions contained in change order No. 8 left the work uncompleted. While the court recognized that defendant was accorded the right under the contract to make certain changes, within specified limitations, in the quantity of the work as might be considered necessary or desirable to complete fully and satisfactorily the proposed construction, it found that the deletions ordered were neither necessary nor desirable to complete the work in a satisfactory manner. The court also found that while the contract allowed defendant to omit items not of a major character deemed unnecessary to the project, the work eliminated by change order No. 8 was necessary to the project and that the effect of the ordered deletions was "to eliminate such an important part of the entire construction as to make the portion that had been constructed of little value for the use intended under the contract." Other findings relating to the first cause of action will be alluded to where pertinent in our subsequent discussion of the issues raised by defendant.

Judgment on the second cause of action was in the sum of $1,735.88. The court found that when defendant issued its stop order, plaintiff was engaged in mixing operations involving the use of an equipment train which sometimes consisted of a tractor and mixer, to which, at times, a water trailer was coupled; occasionally the equipment train comprised a tractor, mixer, water trailer and oil trailer. The tractor was tearing and loosening parts of the sub-base when the water trailer was a part of the equipment train. The court found that the only

change which came about after the stop order in plaintiff's conduct of its mixing operations was the removal of the water trailer from the equipment train, which virtually eliminated the tearing of the sub-base by the tractor. The court found that defendant was aware that this remedial action was neces-. sary at the time the stop order was issued; that under the contract, defendant's right to issue stop orders was dependent on the reasonable necessity therefor; and that since there was no reasonable necessity for the issuance of the stop order of May 31, 1951, plaintiff was entitled to compensation for his expenses incurred thereby.

Defendant attacks the determination made by the court that the contract between the parties contemplated a complete work of improvement and that defendant was liable to plaintiff for loss of profit by virtue of the deletions made in change order No. 8. Defendant argues that the omissions it made are within the limits prescribed in, and authorized by, the agreement.

The pertinent sections of the contract as they relate to plaintiff's first cause of action are as follows:

The notice inviting bids announces that "the work will consist generally of excavation and embankment, grading and bituminous paving to construct approximately 4,100 linear feet of runways and approximately 10,200 linear feet of taxiways, drainage facilities and appurtenant work." Section 10-10 of the standard specifications for construction of airports provides that the contract is to include not only the documents already alluded to, but all supplemental agreements which may be executed "to complete the work in accordance with the intent of the plans and specifications, in an acceptable manner."

Section 40 of the standard specifications covering the scope of the work, provides in part:

"40-01 Intent of Plans and Specifications. *The intent of the plans and specifications is to prescribe a complete work or improvement* which the contractor undertakes to do in full compliance with the plans, the specifications, the special provisions, proposal and contract. The contractor shall do all work including such additional, extra and incidental work *as may be considered necessary to complete the project in a satisfactory and acceptable manner*, as provided in the plans, proposal and contract. . . ." (Italics added.)

"40-03 Changes and Increased or Decreased Quantities of Work. The engineer reserves and shall have the right to make such changes, from time to time, in the plans, the

character, or quantity of the work as may be considered necessary or desirable *to complete fully and acceptably the proposed construction in a satisfactory manner* provided such alterations do not change the total cost of the project, based on the originally estimated quantities and the unit prices bid, by more than twenty-five (25) percent, and provided further that such alterations do not change the total cost of any major item, based on the originally estimated quantities and the unit price bid, by more than twenty-five (25) percent. (A major item shall be construed to be any item, the total cost of which is equal to or greater than ten (10) percent of the total contract price, computed on the basis of the proposal quantity and the contract unit price.) Should it become necessary, for the best interest of the owner, to make changes in excess of that herein specified, the same shall be covered by supplemental agreement." (Italics added.)

"Section 40-04 Omitted Items. The engineer may, in writing, order omitted from the work any item other than major items found *unnecessary to the project* and such omission shall not be a waiver of any condition of the contract nor invalidate any of the provisions thereof. Major items may be omitted by supplemental agreements." (Italics added.)

The work omitted by change order No. 8 amounted to approximately 20 percent of the work. The deletion order eliminated the section of the projected extension of the runways and taxiways that immediately connected with the existing runway, thus leaving a gap in the area between the work done under the contract and the existing runways. Although the work thus deleted left unfinished the link required to effect a union between the work completed under the contract and the existing runways, and though defendant subsequently let another contract to complete this connection, defendant argues that it was entitled to make these deletions under section 40-03 of the specifications. Defendant takes the position "that this section is meaningless unless the engineer for the public body is entitled to use this section to delete at any point in the work" up to 25 per cent of the work within the prescribed qualifications. This contention is fallacious.

In construing a contract, the primary object is to ascertain and give effect to the intention of the parties. (Civ. Code, § 1636; *Hayes* v. *Allen*, 112 Cal.App.2d 676, 681 [247 P.2d 94].) That intention must, in the first instance, be derived from the language of the contract. The words,

phrases and sentences employed are to be construed in the light of the expressed objectives and fundamental purposes of the parties to the agreement. (*Perry* v. *Gross*, 172 Cal. 468, 469 [156 P. 1031].) ▆ A contract entered into by a governmental body and an individual is governed by the same rules which apply to the construction of contracts between private persons. (*M. F. Kemper Const. Co.* v. *City of Los Angeles*, 37 Cal.2d 696, 704 [235 P.2d 7]; *Brown* v. *Town of Sebastopol*, 153 Cal. 704, 709 [96 P. 363, 19 L.R.A. N.S. 178]; *Corporation of America* v. *Durham etc. Co.* 50 Cal. App.2d 337, 340 [123 P.2d 81]; 63 C.J.S. § 1169, p. 853.)

Considering the contract in its entirety, and giving each part a reasonably practical effect (Civ. Code, § 1641), it is patent that defendant's right to order changes in the plans and specifications could be exercised only for the purpose of completing the project as a whole in a more satisfactory manner, or to eliminate therefrom nonmajor items found unnecessary to the project. This is manifest from both the literal language of the agreement and the object contemplated by the parties. Section 40-01 declares "the intent of the plans and specifications is to prescribe a complete work or improvement" and binds the contractor to perform such extra or additional work "as may be considered necessary to complete the project in a satisfactory and acceptable manner." The right to make changes in the quantities of work reserved to the engineer by section 40-03 is not only limited to a percentage of the total cost of the project, but that section expressly relates this right to such changes "*as may be considered necessary or desirable to complete fully and acceptably the proposed construction in a satisfactory manner.*" Section 40-04 permits the engineer to delete "any item other than major items found unnecessary to the project."

There is no question but that, as found by the trial court, the language of this agreement looks to a complete work of public improvement. The term "complete," used both as an adjective and a noun, recurs in the crucial clauses defining the purposes of the agreement and the rights of the parties. "Complete" is defined in Webster's Dictionary as "free from deficiency; entire, absolutely finished." Webster's New International Dictionary ascribes to "complete" such meaning as: "Filled up; with no part, item, or element lacking; . . . entire, perfect, consummate." By the terms of the agreement, plaintiff bound himself to deliver the completed work required of him. ▆ The corollary duty assumed by the

city was to permit plaintiff to consummate the work he had undertaken, subject to its right to make changes, within designated limitations, in order to complete the project more satisfactorily. The deletions ordered by the engineer did not have for their purpose the satisfactory completion of that which both parties set out to accomplish; the fact is that the project was abruptly terminated in an unfinished state, thus leaving the so-called improvement unusable in connection with the existing runways. Nor were those deletions unnecessary to the project—the court found that defendant completed virtually all the work deleted from plaintiff's contract through the medium of a new contract with a different company. In this latter connection, the following language from *Gallagher* v. *Hirsh*, 45 App.Div. 467 [61 N.Y.S. 609, 613], is most appropriate: "It is evident that under the word 'omissions' were intended to be included those things which were . . . left out of the plaintiff's contract, and not such as were taken out of the plaintiff's contract, and given to another to be performed. The word 'omissions' did not mean omitted from the plaintiff's contract but omitted from the work; . . . The words are, 'additions or omissions from the said contract,' evidently meaning additions to or omissions from the work to be done under said contract, which clearly negatives the idea that they were intended to mean that the defendant should have the right to omit the work from the plaintiff's contract, in order to give the contract to another to do the same thing." (See, also, *Shaver* v. *Murdock*, 36 Cal. 293.)

The power vested in the engineer to effect changes in the quantities of the work is not so extensive as to enable him to abrogate or change the contract which the parties executed (*Brown* v. *Coffee*, 17 Cal.App. 381 [121 P. 309, 311]; *Monson* v. *Fischer*, 118 Cal.App. 503 [5 P.2d 628]), nor does it authorize defendant to employ such right to defeat the object of the contract which is reasonably deducible from its terms. The changes which may be ordered, when viewed against the background of the work described in the contract and the language used in the specifications, must clearly be directed either to the achievement of a more satisfactory improvement or the elimination of work not integrally necessary to the project. The purpose of such powers is to maintain a degree of flexibility in adapting conditions to the end sought. However, the discretion committed to the engineer must be exercised within the framework of the contract and for the

purpose of implementing the work originally intended. It cannot be used in an arbitrary manner, divorced from the object and intention of the contract, for the purpose of legitimatizing the deletion of so integral a part of the work as to leave the improvement in an unfinished condition and still insulate the city from liability. (*Langan Const. Corp.* v. *State,* 110 Misc. 177 [180 N.Y.S. 249, 252]; *Drainage Dist. No. 1* v. *Rude,* 21 F.2d 257, 261.) Such a construction would render nugatory plaintiff's fundamental rights under the contract and give to defendant an unconscionable advantage plainly not intended. As we have indicated, the whole scheme of the contract repels the idea that defendant was to have the right to delete work necessary to the project and leave the project in an unusable and incomplete state.

It is conceded by both sides that there are no California cases which have considered the question presented in plaintiff's first cause of action. Nevertheless, there is a plethora of cases from other jurisdictions involving the right of a governmental body to avail itself of an analogous clause in a contract providing for alterations in or omissions from a work of public improvement. An analysis of these authorities establishes unmistakably that this type of provision confers a circumscribed right, which may be properly invoked when it appears necessary and desirable to do so in the interests of completing more satisfactorily the project envisaged by the contract; it has never been held to justify a vitiation of the clearly expressed contractual objective by omissions of an integral part of the work required to accomplish the project. (*Litchfield Const. Co.* v. *City of New York,* 244 N.Y. 251 [155 N.E. 116]; *McMaster* v. *State,* 108 N.Y. 542 [15 N.E. 417]; *Langan Const. Corp.* v. *State,* 110 Misc. 177 [180 N.Y.S. 249]; *Drainage Dist. No. 1* v. *Rude,* 21 F. 2d 257; *Herlihy Mid-Continent Co.* v. *Sanitary Dist.,* 390 Ill. 160 [60 N.E.2d 882]; *Schuehle* v. *City of Seattle,* 199 Wn. 2d 675 [92 P.2d 1109]; *Murray* v. *Kansas City,* 47 Mo.App. 105. See *Gaffey* v. *United Shoe Machinery Co.,* 202 Mass. 48 [88 N.E. 330, 331].) ■ These cases are clear authority for the proposition that a contract provision similar to the one before us may not be invoked to allow deletions from a construction contract which were not made for the purpose of a satisfactory completion of the project, but as an attempt by defendant to exculpate itself from its obligation of counterperformance.

Defendant relies on two cases. *Del Balso Const. Corp.* v.

*City of New York,* 278 N.Y. 154 [15 N.E.2d 559], is clearly distinguishable in that the right was reserved ". . . to omit any portion of the work without constituting grounds for any claim by the contractor for payment or allowance for damages. . . ." No such sweeping, unrestricted power is granted in the contract here under consideration. In fact, the court states that this broad omission clause was made a part of the standard form city contract "only after it had been held that the city could not with impunity omit certain work under the old form of contract." (P. 561 [15 N.E.2d].) It was also stressed that the work omitted did not detract from the ultimate purpose of the contract, which was a completed subway. In *Kinser Const. Co.* v. *State,* 204 N.Y. 381 [97 N.E. 871], plaintiff contracted to build a section of a canal, including a lock which was to be built at a particular point. The state reserved "the right . . . to make such additions to or deductions from such work or changes in the plans and specifications covering the work as may be necessary. . . ." It was found the condition of the soil made it impossible to construct the lock at the designated site; consequently this work was deleted from plaintiff's contract and the lock was relocated in an area where the work was being performed by another contractor. No recovery was allowed plaintiff for loss of profits caused by reason of the deletion. This situation differs vitally from the case at bar. In the Kinser case, the work was eliminated from defendant's contract because it was necessary to relocate the lock in order to complete the canal project. The deletion subserved the purpose of the contract, and came within the language and spirit of the alteration and omission clause. In the instant case, the deletions left a substantial part of the project unfinished (necessitating the subsequent letting of a new contract) and were ordered simply because defendant could not furnish the job site required by the contract.

Defendant also contends that sections 40-03 and 40-04 are modified by section 8-02, which reads in part: "Basis of Payment for changes in Quantities and Extra Work. The unit prices set forth in the proposal will govern the determination of the amount to be added to the Contract price or deducted therefrom on account of changes in the work to be performed.

"The quantities of work in any single addition or deduction, or the net total result of all additions or deductions in this Contract, shall not change the quantity of work under any item in the Proposal by more than 25% of the original quantity included in such item; provided, however, that if the item

comprises less than 10% of the Contract cost, this limitation shall not apply.''

While defendant's claim is perfectly true, section 8-02 relates essentially to providing a formula by which permissible alterations in the contract can be compensated for or adjustments made within prescribed limitations. Thus, it is to be read in connection with section 40-03, and by no means supplants it.

Likewise, defendant can derive no comfort from section 50-02, which reads:

''Finished surfaces in all cases shall conform to the lines, grades, cross-sections, and dimensions shown on the approved plans, and working drawings. Any deviation from the approved plans and working drawings which may be required by the exigencies of construction will be determined by the engineer and authorized by him in writing.''

This clause is contained in section 50 of the specifications, headed ''Control of Work and Material.'' The second sentence refers basically to the sentence which precedes it, and is an illustration of the extent of the engineer's control over physical and mechanical problems that might be encountered in the course of construction. When considered in the context of other sections under this heading, and in relation to the entire contract, it clearly does not purport to give the engineer the power to make the character of change hereinabove discussed. To ascribe such intention to this section would be to empower the engineer to remake the contract and vest in him a control over policy which defendant obviously did not intend to abdicate.

Defendant next argues it should not be held liable for cancelling approximately 20 per cent of the work where, to quote its brief, ''the completion became impossible because of the failure of a third party, particularly where the act of the third party was within the contemplation of the parties to the contract at the time it was entered into.'' Defendant cites no cases* in support of this contention, nor does it refer to any applicable section of the contract. This deficiency may be explained by the fact that the authorities are squarely in opposition to its contention. ▪ The rule is plain that in every construction contract the law implies a covenant, where

---

*Defendant relies solely on Civil Code, section 1636, which reads:

''A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.''

necessary, that the owner will furnish the selected site of operations to the contractor in order to enable him "to adequately carry on the construction and complete the work agreed upon." (*Gray* v. *Bekins,* 186 Cal. 389, 395 [199 P. 767]; *Bomberger* v. *McKelvey,* 35 Cal.2d 607 [220 P.2d 729].) The rule applies with equal force to construction contracts entered into by a municipality. (*Bates & Rogers Const. Co.* v. *Board of Comm'rs,* 274 F. 659; 63 C.J.S., p. 894.) ■ The burden of proving the defense of impossibility is on the party asserting it. (*Paramount Pictures, Inc.,* v. *Sparling,* 93 Cal.App.2d 768, 775 [209 P.2d 968].) ■ Defendant failed to sustain this burden. The record merely shows that defendant could not obtain permission to divert the traffic from the old by-pass road in time to enable plaintiff to proceed with the contract. It was able to get such consent and reroute the traffic at a later time. Defendant failed even to show that it could not, by greater diligence or better planning, have arranged for such diversion to be accomplished at the date required. ■ In order to be an excuse for nonperformance of a contract, the impossibility of performance must attach to the nature of the thing to be done and not to the inability of the obligor to do it. (*Potts Drug Co.* v. *Benedict,* 156 Cal. 322, 333 [104 P. 432, 25 L.R.A.N.S. 609]; *Tuohy* v. *Moore,* 133 Cal. 516, 523 [65 P. 1107].) ■ One who binds himself to a contract which cannot be performed without the consent or cooperation of a third person is not relieved of liability because of his inability to secure the required consent or cooperation. (6 Williston on Contracts (rev. ed.), p. 5413.) The courts hold that this is merely subjective impossibility, which does not excuse nonperformance of a contract. (*Klauber* v. *San Diego Street Car Co.,* 95 Cal. 353, 358 [30 P. 555]; *Fast, Inc.* v. *Shaner,* 183 F.2d 504; 6 Williston on Contracts (rev. ed.) pp. 5411-5412; Rest. Contracts, § 455.) As stated in the Klauber case, *supra*: "The obligor contracts that he can and will control the acts of third parties, so far as necessary to enable him to perform his contract. . . ." This court has expressed the rule applicable to the instant case as follows: "If performance is not inherently impossible, and there is an unconditional promise to perform, nonperformance is a breach where the obligator becomes unable to perform even though through causes beyond his control, since he might have provided against them in his contract (citations)." (*El Rio Oils Ltd.* v. *Pacific Coast Asphalt Co.,* 95 Cal.App.2d 186, 197 [213 P.2d 1], cert. den. 340 U.S. 850 [71 S.Ct. 77, 95 L.Ed. 623].)

 It is perhaps apropos to observe that defendant was not entirely without a way out of the dilemma facing it upon its discovery that the new by-pass would not be available by June 30. Section 70-08 of the specifications deals with adjustment for suspended works. It reads in part: "In the event the contractor is ordered by the engineer, in writing, to suspend work for some unforeseen cause not provided for in the . . . contract . . . and over which the contractor has no control, the contractor may be reimbursed for actual money expended on the job during the period of shutdown. No allowance will be made for anticipated profits." Thus, when defendant was confronted with the unexpected development, it might have proceeded under section 70-08, which gave it the power to suspend work for an indefinite period. It would have been required to reimburse defendant only for actual expenses. It would not have been required to account for loss of profits. However, it was required to allow plaintiff to complete his contract when the obstacle to the progress of the work was removed. Not having done so, it becomes responsive to plaintiff for damages.

 Defendant urges as error the award of damages for work omitted as measured by the items called for in the plans, instead of limiting damages only to the amount of work which would have been necessary to create an improvement usable for the intended purpose. In this connection, defendant argues that change order No. 8 was valid so far as it applied to any items deleted not necessary to fully complete the project and the court erred in refusing to receive evidence to show how much work was needed for a completely usable improvement. This argument is unsound, and constitutes an oblique and artificial attempt to undo the consequences of defendant's breach of its obligation to plaintiff. The excluded evidence would obviously have consisted of a retrospective juggling and pruning of certain of the items deleted from the contract to the end of showing that a completed and functioning project was a practical possibility without their inclusion. But defendant cannot exonerate itself by such specious means. Proof of items that might have been eliminated if the engineer, in the course of the construction, had acted within the authority of the contract to effect deletions necessary or desirable for the completion of the construction was not germane when the evidence showed the deletions were actually ordered simply because defendant could not fulfill its contractual obligations. There

is no intimation in the record that, but for its failure to secure consent to put the new by-pass road in operation, defendant would have in fact made any omissions. The purported testimony would have consisted of mere speculations as to theoretical and hypothetical possibilities, unrelated to the considerations actuating defendant's purpose in ordering the deletions, and was properly rejected.

 Defendant contends that the amount of damages is not supported by the evidence. It complains that plaintiff was allowed to introduce a tabulation entitled "Details of Plaintiff's Claim for Damages," containing certain items numbered as in the contract, a statement of the units deleted from these items, the unit bid price, the total bid price, the unit cost, the total cost, and a column designated "differences" which plaintiff alleged to be his damages. It is to be remarked that this exhibit was offered not for its probative value, but solely to assist the trial court in following the testimony on the topic of damages. For this limited purpose, it was received without objection.

Defendant asserts that in setting forth the units deleted, plaintiff did not adhere entirely to the contract figures but used instead, calculations derived from extrinsic sources. It cites as an example item No. 3. In the contract, item No. 3 called for the removal of approximately 12,110 square yards of bituminous surfacing at $1.00 per square yard. In his tabulation, plaintiff's claim for damages is based on a deletion of 31,500 units. Defendant argues that since plaintiff could only reasonably have expected the removal of 12,110 square yards of bituminous surfacing the damages should have been based upon this figure, instead of on the figure of 31,500 units. This is a most ingenuous approach to the realities of the contract between the parties. It is appropriate to observe that in virtually every instance, except where lump sum items are involved, the contract documents explicitly indicate that the quantities of work are approximations. This is a common practice in construction contracts in order to protect against possible miscalculations and to insure the flexibility necessary to meet the vicissitudes inherent in this type of undertaking. It is perhaps the exceptional situation in which the ultimate quantities of work done comport neatly with the approximate figures used for bid purposes. Section 20-03 of the standard specifications strongly supports the view that neither party could rely upon the estimates of quantity used for bid purposes as the definitive

measure of the work to be done. It is there stated: "An estimate of quantities of work to be done and materials to be furnished under these specifications is given in the proposal. It is the result of careful calculations and is believed to be correct, but it is given only as a basis for comparison of proposals and the award of the contract. The owner does not expressly or by implication agree that the actual quantities involved will correspond exactly therewith; nor shall the bidder plead misunderstanding or deception because of such estimate of quantities, or of the character, location, or other conditions pertaining to the work. Payment to the contractor will be made only for the actual quantities of work performed or materials furnished in accordance with the plans and specifications and it is understood that the quantities may be increased or diminished as hereinafter provided without in any way invalidating the unit bid prices." Thus, though the figures given failed to accurately reflect the quantity of work to be done, plaintiff would be obligated, despite such discrepances, to perform the work necessary to consummate the agreement. Hence, where the contract contemplated the removal of the by-pass road, and if this involved the removal of 31,500 square yards of surfacing, plaintiff could not have successfully asserted that he was required only to remove the 12,110 square yards designated as the estimate.

Without indulging in a circumstantial enumeration of the evidentiary details before the court, we are satisfied from a careful examination of the total contract and the exhibits relating to the project that the removal of bituminous paving from the entire by-pass road within the area described by the plans and specifications was therein provided for.* Under the evidence received, the court found that this would have entailed the removal of 31,500 square yards of paving, instead of 12,110 yards, which proved to be an inaccurate estimate. This is grounded on the premise that the extent of the work could only be ascertained from the requirements of the contract and the contract clearly indicated the by-pass road, a defined segment of the work, was to be removed in its entirety. Not only reason, but authority justifies the court's position. In *Hackett* v. *State*, 103 Cal. 144 [37 P. 156], plaintiff agreed to construct

---

*For example, section 10-01 of the special provisions states in part: "Earthwork will consist of stripping the areas shown on the plans of all grain stubble and roots, excavation and embankment, and the removal of bituminous paving to subgrade of the paved road shown on the Plans as Sepulveda By-Pass."

a sea wall and wharf under a contract where specifications provided: "The work to be done . . . consists in furnishing all materials and erecting a stone embankment, an earth embankment and a wharf." The invitation to bid specified the sea wall to be 1,000 feet long and 200 feet in width, and it was estimated that 216,000 tons of stone and 285,000 cubic yards of earth would be required. Upon completion of the construction it was found that only 119,025 tons of stone and 272,499 cubic yards of earth had been used. Plaintiff brought an action for a breach of contract and claimed damages based on the difference called for in the contract and the quantities actually used. In denying relief, the court observed that the contract called for a defined work of improvement, and that unit prices were recited in the bids because it was not possible to calculate in advance the precise amount of material which would be necessary. Though plaintiff was obligated to erect the wall, whether it required more or less than the quantities estimated, his compensation was governed by the amounts actually required to be paid for at the contract rate. Though the Hackett case is the converse of the situation here presented, the analogy is valid.

There is no merit in defendant's claim that plaintiff did not show in detail how he arrived at his computation of damages as to various items on the tabulation. Both plaintiff and his expert witness testified that their calculations were based on their experience as to the cost of this type of operation. Defendant neither brought out any deficiencies in the sufficiency of this proof under cross-examination nor does its brief show wherein the evidence as to loss of prospective profits is inadequate. Defendant challenges plaintiff's estimates, but does not show that plaintiff lacked the experience, background or capacity to make reliable estimates. ██ In cases of this character, it is difficult to measure with mathematical exactitude the detriment suffered; therefore, it is frequently held that a reasonable certainty only is required. (*McConnell* v. *Corona City Water Co.,* 149 Cal. 60, 67 [85 P. 929, 8 L.R.A.N.S. 1171]; *Holt Mfg. Co.* v. *Thornton,* 136 Cal. 232, 235 [68 P. 708]; *Sobelman* v. *Maier,* 203 Cal. 1, 11 [262 P. 1087].) In the McConnell case, *supra,* the lower court awarded damages for recovery of lost profits after the owner prevented further performance of a contract to construct a tunnel. The court stated: "The court found upon evidence that there were about 1,422 feet of tunnel yet to be

dug, and gave judgment for the profits upon this at the rate of $4.40 per foot. It is true that the character of the soil might have changed in that distance, and with the change in the character of the soil to nonwater-bearing, the profits might have decreased. It is true, also, that water in sufficient quantities might have been encountered before 1,422 feet additional had been driven, in which case, under the contract, the defendant had the right to order a cessation of the work; but as these were matters which could not be determined except by a completion of the contract, which defendant's conduct had prohibited, the court was justified in accepting the evidence which under the circumstances was the best and most convincing that could be offered.'' (Pp. 66-67.) We are likewise satisfied that the court's construction was fairly sustained by the evidence.

Defendant's next contention is couched as follows: ''The damages should have been computed from the estimated quantities in the specifications rather than from the computation of the total work that could in any way have been required of the Respondent (plaintiff).'' As has already been indicated, the estimated figures were merely tentative approximations of the work required to obtain a described improvement. They were not binding as such, but were susceptible of modification when the exact figures became known as the work progressed and took the desired form. This was patently the understanding of the parties. Section 50-03* of the standard specifications lends no support to defendant's suggestion that plaintiff may not capitalize on a so-called discrepancy in the quantum of work without having called this to defendant's attention. We have previously noted that section 50 relates to control of work and materials, and section 50-03 is primarily concerned with achieving uniformity with respect to the dimensions of the

---

*These specifications, the plans, special provisions, and all supplementary plans and documents are essential parts of the contract, and a requirement occurring in one is just as binding as though incurring in all. They are intended to be cooperative to describe and provide for a complete work. In case of discrepancy, figured dimensions, unless obviously incorrect, shall govern over scaled dimensions. Plans shall govern over specifications and special provisions shall govern over both plans and specifications.

''The contractor shall not take advantage of any apparent error or omission in the plans or specifications. In the event the contractor discovers any apparent error or discrepancy, he shall immediately call upon the engineer for his interpretation and decision, and such decision shall be final.''

work required in the plans and specifications, and other contract documents. It does not purport to deal with the amount of work to be performed, and has no bearing upon any claimed right of defendant to omit portions of the work. Furthermore, there is no support in the record on which defendant can predicate its inference that plaintiff was aware of any discrepancy and that he consciously concealed such knowledge from defendant. Nor was this issue raised in the pleadings or urged at the trial. The ultimate fact is that having established the extent to which the existing by-pass road was to be removed, plaintiff was entitled to his loss of anticipated profits on this item. In this connection, defendant points out that the figure of 31,500 square yards used in computing damages as to item 3 is greater than the 25 per cent allowable percentage of increase under section 40-03. However, section 40-03 applies only to changes considered necessary and desirable to complete the project fully and acceptably. In addition, plaintiff was obligated to perform all the work under item. 3 and no change order governed by section 40-03 was necessary to require such performance.

 Defendant asserts the court erred in allowing damages to subcontractors who were not parties to the action where no assignment of their claims for deletions is alleged or proved. In support of this, defendant refers to the following language from section 70-01 of the standard specifications: "The owner will not recognize any subcontractor on the work. The contractor shall at all times when work is in operation be represented either in person, by a qualified superintendent, or other designated representative." This is another example of defendant's attempt to gain comfort from provisions of the contract read out of context and out of focus. As plaintiff points out, this section indicates that the contractor, as the person primarily liable, must in some authorized manner be present at the job site and no subcontractor could vicariously discharge this responsibility. The record shows that defendant was aware that plaintiff subcontracted certain phases of the work and made no objection. There is no substance in defendant's claim that evidence of the subcontracting agreements was hearsay and was of no value in proving the cost of the work. No issue was tendered in the pleadings or at the trial that plaintiff was not the real party in interest. Plaintiff testified under cross-examination that he had paid all monies due one of the sub-

contractors in support of his claim for damages on the second cause of action. No objection was made by defendant that this was hearsay, and it may not now be raised on appeal. Nor was any motion made to strike such testimony as being incompetent. It may not now be claimed that such evidence could not be considered by the court in substantiation of the finding of damages. (*Powers* v. *Board of Public Works*, 216 Cal. 546, 552 [15 P.2d 156].)

Plaintiff's recovery under the second cause of action was founded on a five-day stop order issued by defendant. The court found no reasonable necessity for the order suspending work and awarded plaintiff $1,735.88 for expenses necessitated by the order. In disavowing liability, defendant relies on sections 70-05 and 70-08 of the specifications.* The city asserts it required a period of time to study the conditions under which plaintiff was working in order to recommend a method of operations which could correct defects in plaintiff's performance.

We are in agreement with the lower court's view that although the engineer has considerable latitude in regard to stop orders, he is not empowered to discontinue operations without reasonable necessity therefor. The record shows that plaintiff was never informed as to the reason his mixing operations were unsatisfactory or the reason for the stop order. The court inferred from the evidence before it that rutting and tearing and loosening of the subgrade were due to the presence of a water trailer on plaintiff's equipment train. When the water wagon was unhitched, the conditions mentioned no longer occurred. The court was warranted in finding that a five-day stop order was not reasonably

---

*70-05 ''The engineer shall have the authority to suspend the work wholly, or in part, for such period or periods as he may deem necessary, due to unsuitable weather, or such other conditions as are considered unfavorable for the suitable prosecution of the work, or for such time as is necessary due to the failure on the part of the contractor to carry out orders given or perform any or all provisions of the contract.

''If it should become necessary to stop work for an indefinite period, the contractor shall store all materials in such manner that they will not become an obstruction, nor become damaged in any way, and he shall take every precaution to prevent damage or deterioration of the work performed; provide suitable drainage by opening ditches, shoulder drains, etc., and erect temporary structures where necessary. . . .

70-08 ''In the event the contractor is ordered by the engineer, in writing, to suspend work for some unforeseen cause not provided for in the specifications, special provisions, proposal, contract, or work order and over which the contractor has no control, the contractor may be reimbursed for actual money expended on the job during the period of shut down. No allowance will be made for anticipated profits. . . .''

necessary under such circumstances, and particularly where plaintiff was neither advised of the reason for the order nor given any opportunity to alleviate the difficulty.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied April 8, 1954.